5. Over the years, a practice had been instituted by which Mr. Montgomery would provide to me CD's, DVD's and/or hard drives that allegedly contained the then-current version of the eTreppid Source Code, which I would then store in a secure off-site location. After the unauthorized deletion and removal of the eTreppid Source Code by Mr. Montgomery, I directed a review of those CD's, DVD's and/or hard drives for their content, and it has been determined that – other than one program developed in 2002 and which is currently not being used – these CD's, DVD's and/or hard drives do not and have never contained any of the eTreppid Source Code for any period of time, contrary to the representations made by Mr. Montgomery.

6. All eTreppid products that have been developed and those that are currently under development require access the eTreppid Source Code for maintenance of developed products and continued development of new products. Without the eTreppid Source Code, none of these activities can take place.

7. Without the eTreppid Source Code, the programmers that eTreppid has hired cannot perform their ordinary duties. As a result, eTreppid is currently losing over $10,000.00 per day on wages and other administrative costs in order to retain key personnel – even though these personnel cannot perform their ordinary duties because the eTreppid Source Code is missing.

8. eTreppid currently has various government and commercial contractual obligations that it will be unable to meet without obtaining the eTreppid Source Code. For example, eTreppid has a contract with LLH & Associates, a prime government contractor, worth over One Million Dollars that has been being worked on since May, 2005. Work on this contract requires the eTreppid Source Code.

9. eTreppid has also spent significant time and effort to secure other lucrative government and commercial contracts with its previous customers. At the present time, certain of these additional contracts are very close to being agreed upon, but Mr. Montgomery's actions have forced eTreppid to cancel the previously-scheduled discussions. Further, eTreppid cannot reschedule these discussions until it has recovered a

specific portion of the eTreppid Source Code because its obligations under these additional contracts will require that eTreppid have this specific portion of the eTreppid Source Code. The portion of the eTreppid Source Code needed is referred to herein as the "FOOS eTreppid Source Code portion" for **F**iltering and **O**ther **O**utput **S**teps combination of programs that are used for two separate Department of Defense government development efforts.

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and correct.

Executed this 19th day of January, 2006, at Reno, Nevada.

Warren Trepp

# CONTRIBUTION AGREEMENT

By and Between

INTREPID TECHNOLOGIES, LLC

as "INTREPID"

and

DENNIS MONTGOMERY and BRENDA K. MONTGOMERY,
as Co-Trustees of the MONTGOMERY FAMILY TRUST

as the "Contributor"

and

DENNIS MONTGOMERY

Dated and Executed as of
September 28, 1998

# CONTRIBUTION AGREEMENT

THIS CONTRIBUTION AGREEMENT (the "Agreement") is made and entered into effective as of **SEPTEMBER 28, 1998**, by and between **INTREPID TECHNOLOGIES, LLC**, A Nevada Limited Liability Company ("INTREPID"), on the one hand, and **DENNIS MONTGOMERY and BRENDA K. MONTGOMERY, as Co-Trustees of the MONTGOMERY FAMILY TRUST**, a California revocable trust (the "Contributor") and **DENNIS MONTGOMERY**, an individual ("Montgomery"), on the other hand. This Agreement is made with reference to the following facts:

## STATEMENTS OF FACT:

A. Montgomery has developed and Contributor owns certain software compression technology (as more particularly described herein).

B. Contributor desires to contribute the Contributed Assets (defined below) to INTREPID as its initial Capital Contribution to INTREPID in exchange for a Membership Interest therein, and INTREPID agrees to accept and receive the Contributed Assets in exchange for such Membership Interest, all in accordance with the terms and conditions set forth in this Agreement.

**NOW, THEREFORE, in consideration of the foregoing facts and the mutual covenants, terms, conditions and provisions contained herein, and with the intention of being legally bound hereby, the parties hereto agree as follows:**

## ARTICLE 1
## CONTRIBUTION AND EXCHANGE OF ASSETS

1.1. **Contribution and Exchange.** In exchange for the consideration described in Article 2 hereof, Contributor hereby agrees to transfer, contribute, assign and convey to INTREPID, and INTREPID agrees to accept and receive from Contributor, effective as of the Closing Date (as defined herein) all of the Contributed Assets of Contributor owned by it in exchange for the issuance to Contributor of a Membership Interest in INTREPID equal to a Fifty Percent (50%) Percentage Interest (as those terms are more particularly described in the Limited Liability Company Operating Agreement of INTREPID (the "Intrepid Operating Agreement")).

1.2. **Contributed Assets.** As used in this Agreement, the term "Contributed Assets" shall mean and include, collectively, all the following assets, together with all of Contributor's rights, title and interest therein, tangible and intangible, present or future, including, but not limited to, all development, distribution and exploitation rights, or to any proceeds derived therefrom:

1.2.1. All of Contributor's know-how; trade secrets; patent rights, copyrights, trademarks, licenses and permits, registered or unregistered, pending or approved; software programs and all programming and source codes used in connection therewith or otherwise required to operate any component thereof; and all programming documentation, designs, materials and other information, all in whatever form and wherever located, relating to or used in connection with, or otherwise describing or consisting of any part of, the software compression technology contained on that certain Software Compression Engine Development Program contained on CD No. 1, all of which is being contributed by Contributor hereunder (collectively, the "Technology").

Have it

1.2.2. Certain of Contributor's tangible personal property used in connection the Technology as more particularly described on **SCHEDULE 1.2.2** attached hereto and made a part of this Agreement.

1.2.3. All of Contributor's books and records relating to the Contributed Assets.

1.3. **Excluded Assets and Liabilities.** Notwithstanding any of the foregoing, Contributor is specifically not contributing, transferring or conveying to INTREPID under this Agreement or by any other means, nor is INTREPID acquiring from Contributor, any other tangible or intangible assets of Contributor not specified herein, and expressly is not assuming any claims, liabilities or obligations of Contributor of any kind or nature, whether existing as of the Closing Date or arising thereafter, on account of Contributor's ownership, development, exploitation or operation of the Contributed Assets at any time prior to the Closing Date.

## ARTICLE 2
## CONSIDERATION

2.1. **Consideration; IRC §721(a) Exchange.** In full consideration of the contribution, transfer, assignment and conveyance of the Contributed Assets by Contributor to INTREPID (which transfer is intended to qualify as a contribution of property to an entity in exchange for an interest in such entity pursuant to section 721(a) of the Internal Revenue Code of 1986, as amended), Contributor shall receive, and INTREPID shall issue to Montgomery Trust a membership certificate representing a Membership Interest in INTREPID equal to a Fifty Percent (50%) Percentage Interest (the "Membership Certificate").

2.2. **Fair Market Value; Amount of Contributor's Capital Contribution to INTREPID.** For purposes of valuing Contributor's Capital Contribution to, and becoming a Member of, INTREPID, Contributor and INTREPID hereby acknowledge and agree that the aggregate fair market value of the Contributed Assets shall be their Gross Asset Value (as defined in the Intrepid Operating Agreement) equal to One Million Three Hundred Thousand Dollars ($1,300,000.00) which has been determined in accordance with the Intrepid Operating Agreement. The parties further agree that, for all tax reporting purposes, the allocation among the Contributed Assets shall be as set forth on the allocation schedule attached hereto and made a part hereof as **SCHEDULE 2.2**, which allocation shall be used by each party in preparing their respective applicable income tax returns. Contributor's contribution of the Contributed Assets to INTREPID as its Capital Contribution thereto and its admission as a Member shall be evidenced by his execution and delivery at the Closing of a counterpart signature page to the Intrepid Operating Agreement in accordance with the terms thereof.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF CONTRIBUTOR

As a material inducement to INTREPID to enter into and perform INTREPID's obligations under this Agreement, Contributor and Montgomery hereby make the following representations and warranties, upon which INTREPID is relying and but for which would not have otherwise entered into this Agreement:

3.1 **Power and Authority.** Contributor and Montgomery have the requisite power and authority to execute deliver and perform this Agreement and all related documents, instruments and agreements, each of which will be duly executed and delivered by Contributor and Montgomery at the Closing and shall constitute a valid and binding obligation of Contributor and Montgomery. The execution and delivery of this Agreement, and any agreement agreed to be executed and delivered pursuant hereto, does not and will not

violate any provision of any agreement, order, judgment or decree to which Contributor or Montgomery is a party, or by which Contributor or Montgomery is bound.

3.2 **Title to Contributed Assets.** Contributor has or will have at the Closing good and marketable title to all of the Contributed Assets, free and clear of all security interests, mortgages, pledges, liens, encumbrances, charges, or restrictions of any nature, and specifically including any contingent liabilities or liabilities arising out of any legal proceedings to which Contributor is a party, and there are no other licenses, contracts or agreements outstanding regarding Contributor's right to own, develop, operate, use, sell, transfer, license, distribute or exploit the Contributed Assets, specifically including the Technology.

3.3 **Working Condition of the Technology.** The Technology is developed, is operational and performs in the manner which Contributor has represented to the LLC or its representatives. A working prototype of the Technology has been developed, and Contributor has conducted repeated and varied testing on the Technology, or has caused it to be tested, to ensure the Technology satisfactorily operates under a number of conditions. There are no known programming, coding or other errors which need to be overcome or that would otherwise inhibit or prevent the software from properly operating or performing in the manner which it is designed to do or which Contributor has represented. There is no special hardware or other software program which is required to run or operate the program at any level that is not generally or readily available to the public that would otherwise make it cost prohibitive or unreasonable to manufacture, distribute, license or exploit in any manner the Technology.

3.4 **Legal Proceedings.** Except as set forth on **SCHEDULE 3.4** attached hereto and made a part hereof, neither Contributor or Montgomery has no knowledge of any pending or threatened litigation, governmental investigation or other proceeding against or relating to or affecting Contributor, Montgomery, the Contributed Assets or the transactions contemplated by this Agreement which could have a material adverse affect thereon. To the knowledge of Contributor and Montgomery, no basis for any such action exists, and there is no legal impediment of which Contributor or Montgomery has knowledge to the continued development and exploitation of the Technology or continued use or operation of any of the Contributed Assets in the ordinary course of INTREPID's business.

3.5 **Contracts.** Contributor has delivered to INTREPID copies of all written contracts, obligations and commitments of Contributor entered into in connection with and related to the Contributed Assets, all of which are listed by reference on **SCHEDULE 3.5** attached hereto and made a part hereof.

3.6 **Liabilities.** Contributor has not incurred any material, uninsured obligation or liability, absolute, accrued, contingent or otherwise, which affect the Contributed Assets, and except in connection with the performance of this Agreement, sold, transferred or encumbered any of the Contributed Assets.

3.7 **Tax Returns; Taxes.** Contributor has filed all tax returns required to be filed by, and made all payments required to be made by it, with respect to all local, state and federal income taxes, sales taxes, use taxes, employment taxes and similar taxes due and payable on or before the date of this Agreement. To Contributor's best knowledge, information and belief, there are no such unpaid tax liabilities.

3.8 **Commissions and Fees.** There are no valid claims for brokerage commissions or finders or similar fees in connection with the transaction contemplated by this Agreement which may not have to be asserted against INTREPID resulting from any action taken by Contributor.

3.9 **Compliance with Laws.** Contributor is in compliance with all federal, state and local laws, regulations and ordinances relating to all of the Contributed Assets.

3.10 **No Untrue Representations or Warranties.** No representation or warranty made by Contributor or Montgomery in this Agreement, in any schedule attached hereto, in any certificate furnished

to INTREPID pursuant to this Agreement, or in connection with the transactions contemplated hereby, contains or will contain any untrue statement of a material fact, or omits or will omit to state and material fact necessary to make the statements or facts contained therein not misleading.

3.11 **Disclosure.** Contributor has received copies of the Articles of Organization and the Intrepid Operating Agreement and has had an opportunity to review such documents and to ask questions and to receive answers and/or to review such other documents or instruments as requested by it and/or its independent legal counsel in connection with the transactions contemplated by this Agreement.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF INTREPID

As a material inducement to Contributor to enter into and to perform Contributor's obligations under this Agreement, INTREPID hereby makes the following representations and warranties, upon which the Contributor is relying:

4.1 **Organization and Standing.** INTREPID is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada.

4.2 **Power and Authority.** INTREPID has the requisite power and authority to execute, deliver and perform this Agreement and all related documents, instruments related thereto, each of which shall be duly authorized, executed and delivered by an authorized representative of INTREPID at the Closing and shall constitute a valid and binding obligation of INTREPID.

4.3 **Broker.** INTREPID has neither employed nor otherwise engaged any broker or finder in connection with this Agreement or with respect to the transactions contemplated hereby under terms which would give rise for a claim against Contributor for any brokerage commission, finder's fee or similar payment.

4.4 **Capitalization.** INTREPID is authorized to issue the Membership Certificate upon the Closing, and the Membership Certificate contemplated to be issued hereunder to Contributor will be duly and validly issued and will be fully paid, provided Contributor has fully transferred and conveyed the Contributed Assets to INTREPID in accordance with this Agreement.

4.5 **No Other Representations or Warranties.** Except as otherwise set forth in this Agreement, INTREPID makes no other representations or warranties, express or implied.

## ARTICLE 5
## INTREPID'S CONDITIONS TO CLOSING

All obligations of INTREPID under this Agreement shall be subject to the fulfillment of the following conditions on or prior to the Closing, any or all of which may be waived in writing, in whole or in part, by INTREPID:

5.1 **Contributor's and Montgomery's Representations and Warranties True at Closing.** The representations and warranties of Contributor and Montgomery contained in this Agreement shall be true and correct in all material respects on and as of the Closing with the same force and effect as though made on the date of the Closing.

5.2 **Absence of Litigation.** There shall be no suit, action or other proceeding pending or threatened before any court or before or by any governmental agency in which it is sought to restrain, prohibit, invalidate or set aside in whole or in part the development, manufacturing, use, sale, licensure, distribution or other exploitation of the Technology; the consummation of this Agreement or the transactions contemplated hereby; or to obtain substantial damages in connection therewith.

5.3 **Material Changes.** There shall have been no material changes in Contributor's Contributed Assets, including, but not limited, to any change in the way the Technology operates or performs, and no changes or errors have occurred in, and no alterations have been made in the design or programming of, the Technology that could inhibit, delay or prevent the further development, use, operation, performance or exploitation of the Technology.

5.4 **Approval of Documentation.** The form and substance of all certificates, instruments and other documents delivered or to be delivered by Contributor to INTREPID under this Agreement shall be satisfactory in all respects to INTREPID and its counsel.

## ARTICLE 6
## CONTRIBUTOR'S CONDITIONS TO CLOSING

All obligations of Contributor under this Agreement shall be subject to the fulfillment of the following conditions on or prior to the Closing, any or all of which may be waived in writing, in full or in part, by Contributor

6.1 **INTREPID's Representations and Warranties True at Closing.** The representations and warranties of INTREPID in this Agreement shall be true and correct in all material respects on and as of the Closing with the same force in effect as though made as of the Closing.

6.2 **Approval of Documentation.** The form and substance of all certificates, instruments and other documents delivered or to be delivered by INTREPID to Contributor under this Agreement shall be satisfactory in all respects to Contributor and his counsel.

## ARTICLE 7
## CLOSING; DELIVERIES AT CLOSING

7.1 **Closing; Closing Date.** The closing of the transactions and exchange of documents and property contemplated by this Agreement (the "Closing") shall occur effective as of SEPTEMBER 28, 1998, or soon thereafter at a time and on a date as may be mutually agreed upon between INTREPID and Contributor (the "Closing Date"). At the Closing, the parties shall deliver and exchange the documents and property set forth in Section 7.2 below, or such other documents in substitution therefor as are satisfactory to the recipient and its or his counsel.

7.2 **Deliveries by Contributor at the Closing.**

7.2.1 A final updated SCHEDULE 1.2.2, SCHEDULE 2.2 and SCHEDULE 3.5 hereto.

7.2.2 A duly executed Bill of Sale in a form and substance satisfactory to INTREPID and sufficient to convey, transfer and assign to INTREPID, all rights, title and interest in and to the Contributed Assets, including the Technology.

7.2.3 A duly executed counterpart signature page to the Intrepid Operating Agreement of INTREPID in connection with Contributor becoming a Member of INTREPID and the issuance to INTREPID of the Membership Certificate.

7.2.4 Possession of all of the tangible Contributed Assets pursuant to Article 8 hereof, including, but not limited to, Contributor's tangible personal property, books, records, files and other items relating to the Technology or other items of personal property being acquired and conveyed hereby.

7.2.5 Contributor, at any time before or after the Closing, agrees to execute, acknowledge and deliver any further assignments, conveyances, and other assurances, documents and instruments of transfer, reasonably requested by INTREPID or its counsel, and will take any other action consistent with the terms of this Agreement that may be reasonably requested by INTREPID for purposes of assigning, transferring, granting, conveying, and confirming to INTREPID all of the Contributed Assets, including the Technology and other property to be conveyed pursuant to this Agreement.

7.3 **Deliveries by INTREPID at the Closing.**

7.3.1 The Membership Certificate, duly issued in the name of Contributor.

7.3.2 A final updated SCHEDULE 2.2.

7.3.3 Resolutions adopted by the Management Committee of INTREPID, authorizing the execution and delivery of this Agreement and all related agreements, documents and instruments, and the consummation of the transactions contemplated hereby.

7.3.4 INTREPID, at any time before or after the Closing, agrees to execute, acknowledge and deliver any further documents, waivers and to take any other action consistent with the terms of this Agreement or that may be reasonably requested by Contributor for purposes of confirming to Contributor the valid issuance of the Membership Certificate as described herein or as may otherwise be necessary to consummate the transactions contemplated by this Agreement.

## ARTICLE 8
## POSSESSION OF THE CONTRIBUTED ASSETS

Possession of the Contributed Assets, including the Technology, shall be delivered to INTREPID on the Closing Date; provided, however, that without limiting any other provision of this Agreement, Contributor shall provide authorized representatives of INTREPID reasonable access to the Contributed Assets for the purposes of satisfying INTREPID with respect to the representations, warranties, covenants and agreements of Contributor contained herein and with respect to satisfaction of any conditions precedent to the Closing contained herein.

## ARTICLE 9
## SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION

9.1 **Survival.** All representations, warranties and statements contained in this Agreement or in any schedule attached hereto, or any agreement executed pursuant hereto shall constitute representations and warranties of Contributor and Montgomery, respectively. All such representations and warranties shall survive the date of this Agreement and the Closing Date for a period of five (5) years and

each party covenants with the other parties not to make any claim with respect to such representation and warranties against any party after the date on which such survivor shall terminate.

9.2 **Indemnification.** Contributor and each of its successor trustees, beneficiaries, agents, counsel, successors and assigns (collectively, the "Indemnitors" and individually, an "Indemnitor"), shall indemnify and hold harmless INTREPID and its affiliated and subsidiary entities, and each of their respective officers, directors, shareholders, managers, members, employees, agents, counsel, successors and assigns (collectively, the "Indemnified Persons" and individually, an "Indemnified Person"), of, from and against any and all liabilities, losses, claims, damages, actions, suits, costs, deficiencies and expenses (including, but not limited to, reasonable fees and disbursements of counsel) arising from or by reason of, or resulting from any breach by Indemnitors of any representation, warranty, agreement or covenant contained herein and each document, certificate or other instrument furnished or to be furnished by an Indemnitor hereunder, on, from or after the Closing Date, or arising from or by reason of or resulting from Indemnitors conduct, or the development, ownership, use, operation or exploitation of the Contributed Assets, including the Technology, or from any alleged act of negligence of Indemnitors or its employees, agents or independent contractors in any way relating to the Technology or the Contributed Assets.

9.3 **Indemnification Procedure.** Within sixty (60) days after an Indemnified Person receives written notice of the commencement of any action or other proceeding in respect of which indemnification or reimbursement may be sought hereunder, or within such lesser time as may be provided by law for the defense of such action or proceeding, such Indemnified Person shall notify the Indemnitor(s) thereof. If any such action or other proceeding shall be brought against any Indemnified Person, Indemnitor shall, upon written notice given within a reasonable time following receipt by Indemnitor of such notice from Indemnified Person, be entitled to assume the defense of such action or proceeding with counsel chosen by Indemnitor and reasonably satisfactory to the Indemnified Person; provided, however, that any Indemnified Person may, at his own expense, retain separate counsel to participate in such defense. Notwithstanding the foregoing, Indemnified Person shall have the right to employ separate counsel at Indemnitor's expense and to control his own defense of such action or proceeding if, in the reasonable opinion of counsel to such Indemnified Person: (i) there are or may be legal defenses available to such Indemnified Person or to other Indemnified Persons that are different from or in addition to those available to Indemnitor and which could not be adequately advanced by counsel chosen by Indemnitor, or (ii) a conflict or potential conflict exists between Indemnitor and such Indemnified Person that would make such separate representation advisable; provided, however, that in no event shall Indemnitor be required to pay fees and expenses hereunder for more than one firm of attorneys in any jurisdiction in any one action or proceeding or group of related actions or proceedings. Indemnitor shall not, without the prior written consent of any Indemnified Person, settle or compromise or consent to the entry of any judgment in any pending or threatened claim, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding to which such Indemnified Person is a party unless such settlement, compromise or consent includes an unconditional release of such Indemnified Person from any and all liability of any nature arising or potentially arising from or by reason of such claim, action or proceeding.

In the event Indemnitor shall object to the requested indemnification by written notice received by Indemnified Person within twenty (20) days after notice of the commencement of an action or proceeding is received by Indemnitor, the entitlement of Indemnified Person to the requested indemnification shall be determined by nonbinding arbitration in the following manner: one arbitrator shall be named by the Indemnified Person and one by the Indemnitor within fifteen (15) days of receipt by Indemnified Person of the written notice of contest referred to above. If the two arbitrators cannot agree upon the allowance of the requested indemnification within fifteen (15) days after their appointment, the arbitrators shall appoint a third arbitrator, and the decision of the majority shall be made within twenty (20) days thereafter. All expenses of arbitration shall be paid by the losing party, or if there shall be no clear determination as to the prevailing or losing party, as the case may be, such expenses shall be shared equally by Indemnified Person and Indemnitors, or pro rata among all Indemnified Persons and all Indemnitors, as the case may be.

ARTICLE 10
NOTICES

Except for the items to be delivered at or before the Closing, any notice or communication required or permitted to be given hereunder shall be in writing and may be either (i) personally delivered, which shall be deemed received at the time of actual receipt thereof; or (ii) sent by registered or certified mail, with postage and charges prepaid, which shall be deemed delivered seventy-two (72) hours after deposit in the United States mail; or (iii) delivered by facsimile transmission, which shall be deemed received on the date and at the time of electronic confirmation of such transmission, provided an original mechanical signed copy of such notice or other communication is also immediately deposited in the United States mail with first-class postage and charges prepaid; or (iv) delivered by messenger, FedEx or other trackable courier service, which shall be deemed delivered on the date and at the time as tracked and confirmed by such courier service; and in each case, addressed or delivered to the party to whom the same is directed at such party's address and/or facsimile number set forth below, or at such other address and/or facsimile number as that party may specify by written notice given to the other parties in accordance with this paragraph:

**If to INTREPID:**

INTREPID TECHNOLOGIES, LLC
Attn: Warren Trepp, Its Management Committee Chairman
685 Gary Court
Incline Village, NV 89451
Mailing Address:
P.O. Box 4964
Incline Village, NV 89450
Facsimile: (702) 831-4395

**With a Courtesy Copy to:**

Frye & Hsieh, LLP
Attn: Douglas J. Frye, Esq.
24955 Pacific Coast Highway, Suite A201
Malibu, California 90265-4747
Facsimile: (310) 456-0808

**If to Contributor:**

MONTGOMERY FAMILY TRUST
Attn: Dennis Montgomery and Brenda K. Montgomery, Its Co-Trustees
818 Cheney Court
Lodi, California 95242
Facsimile: (209) 369-7530

**If to Montgomery:**

DENNIS MONTGOMERY
818 Cheney Court
Lodi, California 95242
Facsimile: (209) 369-7530

With a Courtesy Copy to:

TEHIN + PARTNERS
Attn: Nikolai Tehin, Esq.
Bank of America Center
555 California Street, 33rd Floor
San Francisco, California 94104-1609
Facsimile: (415) 951-8808

Where courtesy copies are provided for, the service of any such courtesy copy shall not constitute notice to the party hereunder.

## ARTICLE 11
## GENERAL PROVISIONS

11.1 **Entire Agreement.** The parties agree that all negotiations are merged into this Agreement and that, except for the Bill of Sale, this Agreement constitutes the final, complete and exclusive statement of the terms of the Agreement relating to the contribution of Contributor's Contributed Assets in exchange for the Membership Interest in INTREPID as set forth herein. There are no oral or other written agreements between the parties concerning the subject matter of this Agreement.

11.2 **Amendment; Modification.** This Agreement shall not be deemed modified by oral representation made before or after the execution of this Agreement. Any oral representations or modifications concerning this Agreement shall be of no force and effect. Any amendment or modification to this Agreement shall be valid unless it is in writing and is executed by all parties.

11.3 **No Assignment.** This Agreement may not be assigned by any of the parties hereto without the prior written consent of the other party or parties.

11.4 **Benefit and Burden.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and assigns. The parties hereto agree, for themselves and their heirs, successors and assigns, to execute any instrument in writing which may be necessary or proper in the carrying out of the purposes and intent of this Agreement.

11.5 **No Third Party Beneficiaries.** Except as otherwise provided in this Agreement, no rights or benefits under this Agreement are conferred upon, directly or indirectly, or shall in any way inure to the benefit of any third party not a signatory to this Agreement.

11.6 **Severability.** If any provision of this Agreement as applied to any party or to any circumstance is adjudged by a court to be void and unenforceable, that shall in no way affect any other provision of this Agreement, the application of such provision in any other circumstances, or the validity or enforceability of this Agreement as a whole.

11.7 **No Waiver.** No course of conduct between the parties and no delay or omission of the parties to exercise any right or power given under this Agreement shall: (i) impair the subsequent exercise of any such right or power, or (ii) be construed to be a waiver of any breach or an acquiescence in or consent to the cure of any breach while any other breach shall continue to exist, or be construed to be a waiver of such continuing breach or of any other right or power that shall theretofore have arisen. Every power and remedy granted by law and by this Agreement to either party hereto may be exercised from time to time, as often as may be deemed expedient. All such rights and powers shall be cumulative to the fullest extent permitted by law.

11.8 Affirmative Acts; Additional Documents. At any time and from time to time following the Closing Date, and at each party's own expense, the parties agree to take or perform such further acts and to execute and deliver such further documents, certificates or instruments and to give oath to or acknowledge before a notary public any documents reasonably requested by the other party to implement or complete such party's obligations hereunder or the terms or intent of this Agreement.

11.9 BINDING ARBITRATION OF DISPUTES. EXCEPT FOR ANY PROCEEDINGS ARISING OUT OF OR PURSUANT TO ARTICLE 9 HEREOF, ANY PARTY TO THIS AGREEMENT MAY REQUIRE THE ARBITRATION OF ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT. ANY PARTY MAY INITIATE AND REQUIRE ARBITRATION BY GIVING NOTICE TO THE OTHER PARTIES SPECIFYING THE MATTER TO BE ARBITRATED. IF LEGAL ACTION IS ALREADY PENDING ON ANY MATTER CONCERNING WHICH THE NOTICE IS GIVEN, THE NOTICE SHALL NOT BE EFFECTIVE UNLESS GIVEN BY THE DEFENDANT THEREIN AND GIVEN BEFORE THE EXPIRATION OF TWENTY (20) DAYS AFTER SERVICE OF PROCESS ON THE PERSON GIVING THE NOTICE. EXCEPT AS PROVIDED TO THE CONTRARY IN THESE PROVISIONS ON ARBITRATION, THE ARBITRATION SHALL BE IN CONFORMITY WITH AND SUBJECT TO APPLICABLE RULES AND PROCEDURES OF THE AMERICAN ARBITRATION ASSOCIATION (OR ANY SUCCESSOR THERETO). IF THE AMERICAN ARBITRATION ASSOCIATION IS NOT THEN IN EXISTENCE AND THERE IS NO SUCCESSOR, OR IF FOR ANY REASON THE AMERICAN ARBITRATION ASSOCIATION FAILS OR REFUSES TO ACT, THE ARBITRATION SHALL BE IN CONFORMITY WITH AND SUBJECT TO THE PROVISIONS OF APPLICABLE NEVADA STATUTES (IF ANY) RELATING TO ARBITRATION AT THE TIME OF THE NOTICE. THE ARBITRATORS SHALL BE BOUND BY THIS AGREEMENT AND ALL RELATED AGREEMENTS. PLEADINGS IN ANY ACTION PENDING ON THE SAME MATTER SHALL, IF ARBITRATION IS REQUIRED AS AFORESAID, BE DEEMED AMENDED TO LIMIT THE ISSUES TO THOSE CONTEMPLATED BY THE RULES PRESCRIBED ABOVE.

THE NUMBER AND SELECTION OF ARBITRATOR(S) SHALL BE IN ACCORDANCE WITH THE RULES PRESCRIBED ABOVE, EXCEPT THAT (I) EACH ARBITRATOR SELECTED SHALL BE NEUTRAL AND FAMILIAR WITH THE PRINCIPAL SUBJECT MATTER OF THE ISSUES TO BE ARBITRATED, SUCH AS, BY WAY OF EXAMPLE ONLY, TECHNOLOGY OR SOFTWARE DEVELOPMENT, OR SUCH OTHER SUBJECT MATTER AS MAY BE AT ISSUE, (II) THE TESTIMONY OF WITNESSES SHALL BE GIVEN UNDER OATH, AND (III) DEPOSITIONS AND OTHER REASONABLE DISCOVERY MAY BE ORDERED BY THE ARBITRATOR(S). THE ARBITRATORS SHALL HAVE THE POWER TO GRANT ALL LEGAL AND EQUITABLE REMEDIES AND AWARD COMPENSATORY DAMAGES PROVIDED BY NEVADA LAW, **BUT SPECIFICALLY SHALL NOT HAVE THE POWER TO AWARD PUNITIVE DAMAGES**. THE DECISION OF THE ARBITRATORS SHALL BE FINAL AND UNREVIEWABLE FOR ERROR OF LAW OR LEGAL REASONING OF ANY KIND. EACH PARTY SHALL PAY THE COSTS OF ARBITRATION, INCLUDING ARBITRATORS' FEES, AS AWARDED BY THE ARBITRATOR(S).

11.10 **Waiver of Jury Trial.** WITH RESPECT TO ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY RELATED AGREEMENT, AS TO WHICH NO PARTY INVOKES THE RIGHT TO ARBITRATION HEREIN PROVIDED, OR AS TO WHICH LEGAL ACTION NEVERTHELESS OCCURS, EACH PARTY HEREBY IRREVOCABLY WAIVES ALL RIGHTS IT OR HE MAY HAVE TO DEMAND A JURY TRIAL. THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY THE PARTIES, AND EACH PARTY ACKNOWLEDGES THAT NONE OF THE OTHER PARTIES NOR ANY PERSON ACTING ON BEHALF OF THE OTHER PARTIES HAS MADE ANY REPRESENTATION OF FACT TO INDUCE THIS WAIVER OF TRIAL BY JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. THE PARTIES HERETO EACH FURTHER ACKNOWLEDGE THAT IT OR HE HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OR HIS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY

TO DISCUSS THIS WAIVER WITH COUNSEL. THE PARTIES EACH FURTHER ACKNOWLEDGE THAT IT OR HE HAS READ AND UNDERSTANDS THE MEANING AND RAMIFICATIONS OF THIS WAIVER PROVISION

11.11 **Time is of the Essence.** TIME IS EXPRESSLY DECLARED TO BE OF THE ESSENCE in this Agreement with respect to all of the terms, provisions, covenants and conditions contained herein, including specifically, but not limited to, the payment of any monies or execution and delivery of any documents provided for herein.

11.12 **Construction.** The language in all parts of this Agreement shall be construed, in all cases, according to its fair meaning, and not for or against either party hereto. The parties acknowledge that each party and its or his counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

11.13 **Captions.** The captions and headings contained in this Agreement are inserted for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

11.14 **Variation of Pronouns; Gender.** All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the person or persons may require.

11.15 **Public Notice; Confidentiality.**

11.15.1 **Public Notice.** Subject to the provisions of Section 11.15.2. below, the parties hereto agree that at any time and from time to time following the execution of this Agreement they will mutually agree in writing on the content of all press releases or other written or oral communications to be disseminated to any media or third parties concerning this Agreement or any of its terms or their relationship with one another.

11.15.2 **Confidentiality; Disclosure of Certain Information.** The parties hereto acknowledge and agree that this Agreement, and all negotiations, discussions, matters or information relating hereto, are confidential among them. Except for disclosure to its auditors, lawyers, tax advisors, bankers, underwriters or lenders, or as necessary or desirable for conduct of business, including negotiations with other acquisition candidates, neither party hereto shall disseminate or release to any third party, or use in competition against the other or the other's affiliates, any information regarding any provision of this Agreement, or any financial information regarding the other (past, present or future) that was obtained by the other in the course of the negotiation of this Agreement or in the course of the performance of this Agreement, without the other party's written approval; provided, however, the foregoing shall not apply to information which (i) is generally available to the public other than as a result of a breach of confidentiality provisions; (ii) becomes available on a nonconfidential basis from a source other than the other party or its affiliates or agents, which source was not itself bound by a confidentiality agreement, or (iii) which is required to be disclosed by law, including securities laws or pursuant to court order.

11.16 **Governing Law.** The validity, construction, interpretation and enforcement of this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the laws of the State of Nevada without giving effect to any conflict of law provision.

11.17 **Counterparts.** To facilitate execution, this Agreement may be executed in multiple counterparts, each of which shall be deemed an original Agreement, and all of which shall constitute one Agreement to be effective as of the day and year first above written. It shall not be necessary in making

proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto.

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered, or caused to be executed and delivered by a duly authorized representative, this **CONTRIBUTION AGREEMENT** as of the day and year first above written, which Agreement, when fully executed, shall constitute a valid, binding agreement on all parties.

"INTREPID"

INTREPID TECHNOLOGIES, LLC
A Nevada Limited Liability Company

By:______________________________
WARREN TREPP
Its Management Committee Chairman

**"CONTRIBUTOR"**

MONTGOMERY FAMILY TRUST
A California Revocable Trust

By:______________________________
DENNIS MONTGOMERY, Its Co-Trustee

By:______________________________
BRENDA K. MONTGOMERY, Its Co-Trustee

**"MONTGOMERY"**

______________________________
DENNIS MONTGOMERY, an Individual

# SCHEDULE 1.2.2

---

This schedule is attached to and made a part of that certain Contribution Agreement dated as of September 28, 1998 by and between INTREPID TECHNOLOGIES, LLC, a Nevada limited liability company ("INTREPID"), on the one hand, and DENNIS MONTGOMERY and BRENDA K. MONTGOMERY, as Co-Trustees of the MONTGOMERY FAMILY TRUST, a California revocable trust (the "Contributor"), and DENNIS MONTGOMERY, an individual ("Montgomery"), on the other hand.

---

**The following is a list of all tangible personal property of Contributor being contributed, assigned, transferred and conveyed to INTREPID pursuant to Section 1.2.2 of the Agreement:**

[TO BE COMPLETED]

# SCHEDULE 2.2

This schedule is attached to and made a part of that certain Contribution Agreement dated as of September 28, 1998 by and between INTREPID TECHNOLOGIES, LLC, a Nevada limited liability company ("INTREPID"), on the one hand, and DENNIS MONTGOMERY and BRENDA K. MONTGOMERY, as Co-Trustees of the MONTGOMERY FAMILY TRUST, a California revocable trust (the "Contributor"), and DENNIS MONTGOMERY, an individual ("Montgomery"), on the other hand.

**The following allocation of the consideration for the Contributed Assets pursuant to the Agreement is hereby made, agreed and delivered pursuant to Section 2.2 thereof:**

| | |
|---|---|
| Technology | $________.00 |
| Tangible Personal Property | $________.00 |
| TOTAL CONSIDERATION: | $ 1,300,000.00 |

# SCHEDULE 3.4

This schedule is attached to and made a part of that certain Contribution Agreement dated as of September 28, 1998 by and between INTREPID TECHNOLOGIES, LLC, a Nevada limited liability company ("INTREPID"), on the one hand, and DENNIS MONTGOMERY and BRENDA K. MONTGOMERY, as Co-Trustees of the MONTGOMERY FAMILY TRUST, a California revocable trust (the "Contributor"), and DENNIS MONTGOMERY, an individual ("Montgomery"), on the other hand.

**The following is a list of all legal proceedings of Contributor or Montgomery relating to Contributor, Montgomery or the Contributed Assets to be disclosed by Contributor and Montgomery pursuant to Section 3.4 of the Agreement:**

1. Montgomery has an outstanding judgment against him, individually, in the sum of $335,000.00 (plus interest accruing thereon) for adverse attorneys' fees and costs arising out of a failed arbitration involving 3NET SYSTEMS, INC., which judgment and arbitration, as represented and warranted by Montgomery, do not adversely affect in any manner the Contributed Assets, including the Technology.

# SCHEDULE 3.5

This schedule is attached to and made a part of that certain Contribution Agreement dated as of September 28, 1998 by and between INTREPID TECHNOLOGIES, LLC, a Nevada limited liability company ("INTREPID"), on the one hand, and DENNIS MONTGOMERY and BRENDA K. MONTGOMERY, as Co-Trustees of the MONTGOMERY FAMILY TRUST, a California revocable trust (the "Contributor"), and DENNIS MONTGOMERY, an individual ("Montgomery"), on the other hand.

**The following is a list of all written contracts, obligations and other commitments of Contributor relating to the Contributed Assets to be delivered to INTREPID and disclosed by Contributor pursuant to Section 3.5 of the Agreement:**

[TO BE COMPLETED]

# BILL OF SALE

**THIS BILL OF SALE** is made, entered into and delivered effective as of **SEPTEMBER 28, 1998**, pursuant to the terms and conditions of that certain Contribution Agreement dated as of September 28, 1998, by and between **INTREPID TECHNOLOGIES, LLC**, a Nevada limited liability company ("INTREPID"), on the one hand, and **DENNIS MONTGOMERY and BRENDA K. MONTGOMERY, as Co-Trustees of the MONTGOMERY FAMILY TRUST**, a California revocable trust ("Contributor"), and **DENNIS MONTGOMERY**, an individual ("Montgomery"), on the other hand (the "Contribution Agreement"). Unless otherwise defined herein, the terms used in this Bill of Sale shall mean and refer to those terms as defined in the Contribution Agreement.

**NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION**, the receipt and sufficiency of which is hereby acknowledged, Contributor hereby sells, transfers, assigns and conveys unto INTREPID all of its rights, title, and interest in and to the following tangible and intangible property and assets which constitute all of the "Contributed Assets" being contributed by Contributor to INTREPID under the terms of the Contribution Agreement:

1. All of Contributor's know-how; trade secrets; patent rights, copyrights, trademarks, licenses and permits, registered or unregistered, pending or approved; software programs and all programming and source codes used in connection therewith or otherwise required to operate any component thereof; and all programming documentation, designs, materials and other information, all in whatever form and wherever located, relating to or used in connection with, or otherwise describing or consisting of any part of, the software compression technology contained on that certain Software Compression Engine Development Program contained on CD No. 1, being contributed by Contributor pursuant to the terms of the Contribution Agreement (collectively, the "Technology");

2. Certain of Contributor's tangible personal property used in connection the Technology as more particularly described on **SCHEDULE 1.2.2** attached hereto and made a part of this instrument; and

3. All of Contributor's books and records relating to the Contributed Assets.

Contributor hereby represents and warrants to INTREPID that it is the lawful and equitable owner of the above-described Contributed Assets, and it has the free right to contribute, convey, transfer and assign its entire interest therein without the consent or permission of, and without the requirement of any notice to, any person or entity. Contributor represents and warrants to INTREPID that, except as otherwise disclosed to it under the Contribution Agreement, all of the Contributed Assets are free and clear of any and all liens, security interests, charges, burdens, claims, restrictions or encumbrances whatsoever.

Each of Contributor and INTREPID hereby acknowledge and confirm that this Bill of Sale and the sale, transfer, assignment and conveyance of title to the Contributed Assets set forth herein by Contributor to INTREPID hereunder is being executed and delivered pursuant to the Contribution Agreement. This Bill of Sale and the conveyance of title to the Contributed Assets to INTREPID hereunder shall be effective immediately upon execution and delivery hereof at the Closing.

In the event of any litigation, arbitration or other dispute arising as a result of or by reason of this Bill of Sale or the subject matter hereof, the prevailing party in any such litigation, arbitration or other dispute shall be entitled to, in addition to any other damages assessed, its reasonable attorneys' fees, and all other costs and expenses incurred in connection with settling or resolving such dispute. The attorneys' fees which the prevailing party is entitled to recover shall include fees for prosecuting or defending any appeal and shall be

awarded for any supplemental proceedings until the final judgment is satisfied in full. In addition to the foregoing award of attorneys' fees to the prevailing party, the prevailing party in any lawsuit or arbitration procedure on this instrument shall be entitled to its reasonable attorneys' fees incurred in any post judgment proceedings to collect or enforce the judgment.

The validity, construction, interpretation and enforcement of this Bill of Sale, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the laws of the State of Nevada without giving effect to any conflict of law provision.

**IN WITNESS WHEREOF**, the parties hereto have executed, or caused to be executed by a duly authorized representative, this **BILL OF SALE** effective as of the day and year first above written and to be delivered at the Closing.

**"CONTRIBUTOR"**

MONTGOMERY FAMILY TRUST
A California Revocable Trust

By:____________________
DENNIS MONTGOMERY, Its Co-Trustee

By:____________________
BRENDA K. MONTGOMERY, Its Co-Trustee

**ACKNOWLEDGED AND RECEIVED BY:**

**"INTREPID"**

INTREPID TECHNOLOGIES, LLC
A Nevada Limited Liability Company

By:____________________
WARREN TREPP
Its Management Committee Chairman

# SCHEDULE 1.2.2

This schedule is attached to and made a part of that certain Bill of Sale dated as of September 28, 1998, from DENNIS MONTGOMERY and BRENDA K. MONTGOMERY, as Co-Trustees of the MONTGOMERY FAMILY TRUST, a California revocable trust (the "Contributor") in favor of INTREPID TECHNOLOGIES, LLC, a Nevada limited liability company ("INTREPID").

**The following is a list of all tangible personal property of Contributor being contributed, assigned, transferred and conveyed to INTREPID pursuant to the accompanying Bill of Sale:**

[TO BE COMPLETED]

ORIGINAL

CODE: 3370

FILED

2006 JAN 20 PM 3:31

RONALD A. LONGTIN, JR.

BY D. Jaramillo

DEPUTY

IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WASHOE

*****

ETREPPID TECHNOLOGIES, L.L.C., a California Corporation,

Plaintiff,

vs.

DENNIS MONTGOMERY, an individual; and DOES 1 through 20,

Defendants.

_______________________________________/

Case No.: CV06-00114

Dept. No: 10

**ORDER DENYING TEMPORARY RESTRAINING ORDER; ORDER ASSIGNING MATTER TO BUSINESS COURT FOR HEARING**

THE MATTER of Plaintiff's eTreppid Technologies, L.L.C.'s *Ex Parte* Application for a Temporary Restraining Order and Motion for a Preliminary Injunction Against Dennis Montgomery, come before this Court in chambers on January 19, 2006.

Jerry M. Snyder, Esq., appeared for Plaintiff, eTreppid Technologies, L.L.C., and Eric A. Pulver, Esq., appeared for Defendant, Dennis Montgomery.

The Court reviewed Plaintiff's eTreppid Technologies, L.L.C.'s Complaint, *Ex Parte* Application for a Temporary Restraining Order and Motion for a Preliminary Injunction Against Dennis Montgomery, and various Declarations submitted by Plaintiff. After being fully advised in the premises and after considering argument by counsel, and good cause appearing, the Court enters the following order:

NOW, THEREFORE, IT IS HEREBY ORDERED:

1. Plaintiff's eTreppid Technologies, L.L.C.'s *Ex-Parte* Application for a Temporary Restraining Order is hereby DENIED without prejudice, since Plaintiff has not met the standard of proof as required by NRCP 65(b) and (c) at the meeting with the Court;

2. That this matter is hereby assigned to Department 10, one of the Business Court Departments, Honorable Steven P. Elliott presiding, who shall set a hearing on Plaintiffs application for a Temporary Restraining Order, on or before Wednesday, January 25, 2006. Both parties to be noticed and the application is to be renewed if the Plaintiff so desires.

Dated this 20th day of January, 2006.

DISTRICT JUDGE

Code $3375
RONALD J. LOGAR, ESQ.
Nevada Bar #00303
ERIC A. PULVER, ESQ.
Nevada Bar #07874
JENNIFER CHRISTIE, ESQ.
Nevada Bar # 8025
LAW OFFICES OF LOGAR & PULVER, PC
225 S. Arlington Ave., Ste A
Reno, Nevada 89501
(775) 786-5040
Attorney for Respondent

FILED
2006 JAN 20 PM 3:33
RONALD A. LONGTIN, JR.
BY D. Jaramillo
DEPUTY

IN THE SECOND JUDICIAL DISTRICT COURT IN THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WASHOE

*****

ETREPPID TECHNOLOGIES, L.L.C., a California Corporation,

Plaintiff,

vs.

DENNIS MONTGOMERY, an individual; and DOES 1 through 20,

Defendants.

Case No.: CV06-00114
Dept. No: 10

**PEREMPTORY CHALLENGE OF JUDGE**

NOTICE TO: eTreppid Technologies, L.L.C., and their attorney Jerry M. Snyder, Esq.

Notice of Peremptory Challenge of Judge:

Notice is hereby given that Defendant, Dennis Montgomery, by and through his attorney ERIC A. PULVER, ESQ., pursuant to Supreme Court Rule 48.1, hereby submits his fee of $300.00 and peremptory challenges the Honorable Steven P. Elliot as judge in the above-captioned matter.

DATED this 20th day of January, 2006.

By: [signature]
Eric A. Pulver, Esq.
Attorney for Defendant

CERTIFICATE OF SERVICE

Pursuant to NRCP 5(b), I certify that I am an employee of the LAW OFFICE OF LOGAR & PULVER, APC, and that on the 23rd day of January, 2006, I

_____ deposited for mailing in the U.S. Mail, with sufficient postage affixed thereto via Certified Mail, Return Receipt requested.

_____ sent via Federal Express or other overnight delivery service

_____ delivered via facsimile machine to fax number _______________

_____ personally delivered

X caused to be delivered via Reno-Carson Messenger Service

the foregoing document, addressed to:

Jerry M. Snyder, Esq.
Hale Lane Peek Dennison and Howard
5441 Kietzke Lane
Second Floor
Reno, NV 89511

LEZLIE M. LUCAS
Legal Assistant to the
Law Office of Logar & Pulver, PC

1520
J. Stephen Peek, Esq. (NV Bar #1758)
Jerry M. Snyder, Esq. (NV Bar #6830)
Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, NV 89511
Tel: (775) 327-3000
Fax: (775) 786-6179

PILLSBURY WINTHROP SHAW PITTMAN, L.L.P.
DAVID A. JAKOPIN, CA Bar No. 209950
JONATHAN D. BUTLER, CA Bar No. 229638
2475 Hanover Street
Palo Alto, CA 94304-1114
Telephone: (650) 233-4500
Facsimile: (650) 233-4545
Application for Admission *Pro Hac Vice* forthcoming
Attorneys for Plaintiff

FILED
2006 JAN 20 PM 12: 52
RONALD A. LONGTIN, JR.
BY A. Simpson
DEPUTY

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

**IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA**

**IN AND FOR THE COUNTY OF WASHOE**

ETREPPID TECHNOLOGIES, LLC., a California Corporation,

Plaintiff,

vs.

DENNIS MONTGOMERY, an individual; and DOES 1 through 20,

Defendant.

CASE NO. CV06-00114

DEPT. NO. 10

**SUPPLEMENTAL DECLARATION OF JERRY M. SNYDER IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER**

Pursuant to N.R.S. 600A.070.3, Plaintiff hereby lodges the enclosed record conditionally under seal and will make a motion or application to the Court for an order permitting the record to be filed under seal.

///

///

I, Jerry M. Snyder, declare under penalty of perjury under the laws of the State of Nevada:

1. I am an attorney duly licensed to practice in the State of Nevada and am an associate with the law firm of Hale Lane Peek Dennison and Howard. I represent eTreppid Technologies, LLC ("eTreppid") in the above-captioned matter. I have personal knowledge of, and if called, could competently testify as to, the matters contained herein.

2. eTreppid has alleged that Defendant Dennis Montgomery was the former Chief Technology Officer at eTreppid. Mr. Montgomery held this position since 1998, when the company was founded. ETreppid is currently developing and marketing various different products, including anomaly detection and pattern recognition software.

3. On Thursday, January 19, 2006, Plaintiff eTreppid sought a temporary restraining order in Department 3 to (1) enjoin defendant Dennis Montgomery, eTreppid's former Chief Technology Officer, from "destroying the eTreppid Source Code, which eTreppid is informed and believes is currently in your possession and/or control, and you and all persons or entities in active concert or participation with you are hereby ORDERED to immediately provide eTreppid with the portion of the eTreppid Source Code known as the 'FOOS eTreppid Source Code portion', for Filtering and Other Output Steps combination of programs that are used for two separate Department of Defense government development efforts."

4. The undersigned counsel, Mr. Montgomery, and Montgomery's attorney, Eric Pulver, Esq. met in Judge Polaha's Chambers to discuss eTreppid's request for a TRO. During such meeting, Montgomery represented to the Court that (1) he did not have the subject storage device on which a backup copy of the eTreppid Source Code was stored, or any of the eTreppid Source Code, and (2) that the underlying technology for this source code, which includes anomaly detection and pattern recognition software, belongs to Montgomery. Montgomery asserted that he did not assign this anomaly detection and pattern recognition software technology to eTreppid, rather, he assigned only certain video compression technology to eTreppid.

5. Montgomery's assertion that he owns the underlying technology is not true. Not only did he use eTreppid facilities, computers, employees and other tools as set forth in the moving papers, as well as was paid for his services, but furthermore, as Montgomery had a fiduciary duty to eTreppid,

Hale Lane Peek Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511

illustrating further that eTreppid owns this technology. Attached hereto as **Exhibit 1** is a true and correct copy of the **eTreppid Operating Agreement**, which was signed by Mr. Montgomery. At Paragraph 6.5 of this agreement, Mr. Montgomery agrees that "the services of Dennis Montgomery. . . so long as he is serving as a Committee Member and/or Chief Technology Officer pursuant to this agreement, shall be exclusive to the LLC, and he shall devote substantially all of his full time and attention and efforts to the Business and affairs of the LLC."

6. Mr. Montgomery further agrees, in the Operating Agreement, that while he was the CTO, he would not "compete with the LLC . . . (1) by developing, licensing or exploiting in any manner any software programs or other technology which is competitive with the technology or the business of the LLC."

7. Thus, Mr. Montgomery's assertion that he owns the subject pattern recognition and anomaly detection technology is further contradicted by the eTreppid Operating Agreement, which Mr. Montgomery executed.

DATED: This 20 of January, 2006.

Jerry M. Snyder

[illegible] Lane Peck Dennison and Howard
5441 Kietzke Lane, Second Floor
Reno, Nevada 89511




# AMENDED AND RESTATED OPERATING AGREEMENT

OF

eTreppid Technologies, LLC
A Nevada Limited-Liability Company

Dated and Adopted
Effective as of November 1, 2001

# AMENDED AND RESTATED OPERATING AGREEMENT

# OF

# eTreppid Technologies, LLC

**THIS AMENDED AND RESTATED OPERATING AGREEMENT** is made and entered into and effective as of **NOVEMBER 1, 2001**, by and among those Members (defined below) executing this Agreement, eTreppid Technologies, LLC, a Nevada limited-liability company (the "Company" or "LLC"), and any other Persons (defined below) who shall in the future become bound by the terms hereof.

This Agreement is made with reference to the following facts:

## STATEMENTS OF FACT:

A. eTreppid Technologies, LLC was formed by the filing of the Articles of Organization with the Nevada Secretary of State on September 28, 1998, for the formation pursuant to the applicable provisions of the NRS (as defined herein).

B. Effective September 28, 1998, the Company and its Members entered into and adopted the Operating Agreement of eTreppid Technologies, LLC (formerly known as "Intrepid Technologies, LLC") (the "Original Agreement").

C. Effective January 1, 1999, the Company and its Members adopted the Amended and Restated Operating Agreement of eTreppid Technologies, LLC to amend and restate the Original Agreement in its entirety (the "Restated Agreement").

D. The Restated Agreement was amended by First Amendment dated effective July 7, 2000, and by Second Amendment dated effective May 25, 2001 (the "Amended Agreement").

E. The Management Committee and its Members who are entitled to Vote have deemed that it is in the best interests of the Company and all of its Members to amend and restate the Amended Agreement in its entirety as set forth herein.

**NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants and conditions contained herein, and with the intention of being legally bound hereby, the parties hereto agree as follows:**

## ARTICLE 1
## DEFINITIONS

Except as otherwise separately defined elsewhere in this Agreement, following are the terms and meanings as used throughout this Agreement:

1.1. "**Additional Units**" shall have the meaning set forth in Section 3.8.

1.2. "**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

1.2.1. Increase such Capital Account by any amounts which such Member is obligated to contribute to the LLC (pursuant to the terms of this Agreement or otherwise) or is deemed to be obligated to contribute to the LLC pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

1.2.2. Reduce such Capital Account by the amount of the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

1.3. "**Affiliate**" means, when used with reference to a specified Person, (i) the Principal of the Person, (ii) any Person directly or indirectly controlling, controlled by or under common control with such Person, (iii) any Person owning or controlling TEN PERCENT (10%) or more of the outstanding voting interests of such Person, and (iv) any relative or spouse of such Person.

1.4. "**Agreement**" means this Amended and Restated Operating Agreement of the LLC, as originally executed and as amended from time to time hereafter, as the context requires. Words such as "herein," "hereinafter," "hereto," "hereby" and "hereunder," when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

1.5. "**Articles of Organization**" means, collectively, the Articles of Organization filed with the Secretary of State (hereinafter defined) on SEPTEMBER 28, 1998, Filing No. LLC-5563-98 for the purpose of forming the LLC, as amended by Certificate of Amendment filed with the Secretary of State on April 19, 2000, to change the name of the LLC, and any subsequent certificates and restatements to the Articles of Organization duly adopted in accordance with this Agreement and properly filed and endorsed by the Secretary of State.

1.6. "**Available Cash Flow**" means, with respect to any Fiscal Year or other period, the sum of all cash receipts of the LLC from any and all sources, less all cash disbursements (including loan repayments, capital improvements and replacements) and a reasonable allowance for Reserves, contingencies and anticipated obligations as determined by the Management Committee.

1.7. "**Book Depreciation**" means for each Fiscal Year or other period, an amount equal to the Depreciation, except that if the Gross Asset Value of any asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, "book depreciation" with respect to such asset shall, except as otherwise required by Regulations Section 1.704-3(d), be an

amount which bears the same ratio to such beginning Gross Asset Value as the Depreciation with respect to such asset for such year or other period bears to such beginning adjusted tax basis. However, if the federal income tax Depreciation with respect to such asset for such year is "zero," book depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the LLC.

1.8 "**Business**" or "**Business of the LLC**" means the business of the LLC as defined in Section 2.6 hereof.

1.9. "**Capital Account**" of a Member at any given date shall have the meaning set forth in Section 3.4.3 hereof and shall be determined in accordance with Section 3.5 hereof.

1.10. "**Capital Contribution**" shall have the meaning set forth in Section 3.6.1 hereof.

1.11 "**Class A Member(s)**" means those Members receiving a Priority Return (defined below) and having priority over the Class B Members in distributions from the LLC and in voting rights.

1.12. "**Class B Member(s)**" means those Members receiving a Priority Return and receiving subordinated distributions from the LLC until the Class A Members and Class C Members have received their Priority Return and a return of their aggregate Capital Contributions to the LLC. The Class B Members shall have no voting rights.

1.13. "**Class C Member(s)**" means those Members receiving a Priority Return and having priority over the Class B Members in distributions from the LLC. The Class C Members shall have no voting rights.

1.14. "**Code**" means the Internal Revenue Code of 1986, as amended, or any corresponding provision or provisions of any succeeding law.

1.15. "**Committee Member(s)**" means any or all of the three (3) Persons appointed by the Class A Members to serve on the Management Committee pursuant to Section 6.1.4 of this Agreement. The Committee Members shall at all times act collectively as the Management Committee, which shall be charged with those powers, duties and responsibilities as set forth in Article 6 and elsewhere in this Agreement.

1.16. "**Depreciation**" means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery reduction allowable with respect to an asset for such Fiscal Year or other period.

1.17. "**Dissolution**" means (i) when used with reference to the LLC, the earlier of (a) the date upon which the LLC is terminated pursuant to this Agreement, the NRS, or any similar provision enacted in lieu thereof, or (b) the date upon which the LLC ceases to be a going concern, and (ii) when used with reference to any Member, the earlier of (a) the date upon which there is a Dissolution of the LLC or (b) the date upon which such Member's entire Interest in the LLC is terminated by means of a distribution or series of distributions by the LLC to such Member.

1.18. "**Economic Interest**" means a Person's right to share in the Net Profits, Net Losses or similar items pursuant to Sections 4.1.1.4 and 4.1.2.5 hereof, and to receive distributions from the LLC pursuant to Sections 5.2.5 and 10.4.5 hereof, which the assignor of such economic interest would otherwise be entitled, but does not include any other rights of a Member including, without limitation, the right to Vote, to participate in the management of the Business and the affairs of the LLC, or any right to information concerning the Business of the LLC.

1.19. "**Fiscal Year**" means the fiscal year of the LLC, running for the period of JANUARY 1 to and including DECEMBER 31 of each calendar year.

1.20. "**Gross Asset Value**" means, with respect to any asset of the LLC, the asset's adjusted basis for federal income tax purposes, except as follows:

1.20.1. The initial Gross Asset Value of any asset contributed by a Member to the LLC shall be the gross fair market value of such asset, as agreed between the LLC and the contributing Member.

1.20.2. The Gross Asset Value of all LLC assets shall be adjusted to equal their respective gross fair market values, as mutually agreed between the LLC and the affected Member(s) upon the occurrence of the following events:

1.20.2.1. The acquisition of an additional Interest in the LLC by any new or existing Member in exchange for more than a *de minimis* Capital Contribution;

1.20.2.2. The distribution by the LLC to a Member of more than a *de minimis* amount of cash or property as consideration for the acquisition of all or a portion of such Member's Interest in the LLC if the LLC reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the LLC; and

1.20.2.3. The liquidation of the LLC within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g);

1.20.3. The Gross Asset Value of any LLC asset distributed to any Member shall be the gross fair market value of such asset as mutually agreed by the LLC and the affected Member(s) on the date of distribution.

1.20.4. The Gross Asset Value of the LLC assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code section 734(b) or Code section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant Regulations Section 1.704-1(b)(2)(iv)(m) and Section 4.9 hereof; provided, however, that Gross Asset Value shall not be adjusted pursuant to this Section 1.20.4 to the extent the LLC determines that an adjustment pursuant to Section 1.20.2 above is necessary or appropriate in connection with the transaction that would otherwise result in an adjustment under this Section 1.20.4.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to Sections 1.18.1, 1.18.2 or 1.18.4 above, such Gross Asset Value shall thereafter be adjusted by the Book Depreciation taken into account with respect to such asset for purposes of computing profits and losses.

1.20.5. If the LLC and any affected Member pursuant to Sections 1.18.1, 1.18.2 or 1.18.3 above are unable to agree on the Gross Asset Value of any asset for purposes of this Agreement, a mutually acceptable appraiser shall be selected by them for this purpose, and the value established by such appraisal shall be binding upon the LLC and the affected Member.

1.21. "**Guaranteed Payment**" has the meaning set forth in Section 6.7.2 of this Agreement.

1.22. "**LLC**" or "**Company**" means eTreppid Technologies, LLC, the Nevada limited-liability company formed pursuant to the Articles of Organization.

1.23. "**LLC Loans**" shall refer to any loans, lines of credit or advances made by any Member to the LLC. Except as otherwise specified in this Agreement, such LLC Loans shall bear interest at the rate agreed to between the Member and the Management Committee.

1.24. "**LLC Minimum Gain**" means the amount determined by computing with respect to each nonrecourse liability of the LLC, the amount of gain (of whatever character), if any, that would be realized by the LLC if it disposed (in a taxable transaction) of the Property subject to such liability in full satisfaction thereof, and for no other consideration, and subject to the other rules set forth in Regulations Section 1.704-2, and by then aggregating the amounts so computed as set forth in Regulations Section 1.704-2(d).

1.25. "**Majority in Interest**" or "**Majority in Interest of the Members**" means, unless otherwise provided in the Agreement, the Percentage Interests of the Class A Members, which, taken together, exceed FIFTY PERCENT (50%) of the aggregate of all Percentage Interests held by all Class A Members entitled to Vote or grant consent with respect to the matter in question.

1.26. "**Management Committee**" means, collectively, the three (3) Committee Members appointed by the Class A Members to manage the LLC pursuant to Section 6.1 of this Agreement acting together to manage the LLC in accordance with the terms and conditions of this Agreement. The Management Committee shall be charged with those powers, duties and responsibilities as set forth in Article 6 and elsewhere in this Agreement.

1.27. "**Manager**" means the Person appointed under Section 6.1.1 of this Agreement to manage the LLC. The Manager shall be charged with those powers, duties and responsibilities as set forth in Article 6 and elsewhere in this Agreement.

1.28. "**Member**" means a Person who:

1.28.1. Has been admitted to the LLC as a Class A Member, a Class B Member or a Class C Member in accordance with this Agreement, and who has become a Member pursuant to Section 8.3 hereof.

1.28.2. Has not resigned, withdrawn or been expelled as a Member or, if other than an individual, has been dissolved.

1.28.3. Has paid his Capital Contribution to the LLC in exchange for Units in the LLC, or, in the case of a transferee Member, has succeeded to the Capital Account of the transferor Member, and who has become a party to this Agreement by executing and submitting to the Manager a counterpart signature page to this Agreement accepting the terms and conditions of, and agreeing to be bound by, this Agreement.

Reference to a "Member" shall be to any one of the Class A Members, the Class B Members or the Class C Members of the LLC identified in Section 3.1 below or as otherwise supplemented and identified on **EXHIBIT A** attached to and made a part of this Agreement, which exhibit may be amended or modified from time to time without the consent of the Members.

1.29. "**Member Nonrecourse Debt**" has the meaning set forth in Regulations Section 1.704-2(b)(4) for "partner nonrecourse debt."

1.30. "**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the LLC Minimum Gain that would result if such Member Nonrecourse Debt were treated as a nonrecourse liability of the LLC, determined in accordance with Regulations Sections 1.704-2(i)(2) and (3).

1.31. "**Member Nonrecourse Deductions**" has the meaning set forth in Regulations Section 1.704-2(i)(2) for "partner nonrecourse deductions." The amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt for a Fiscal Year of the LLC equals the excess (if any) of the net increase (if any) in the amount of Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt during that Fiscal Year over the aggregate amount of any distributions during that Fiscal Year to the Member that bears (or is deemed to bear) the economic loss for such Member Nonrecourse Debt to the extent such distributions are from the proceeds of such Member Nonrecourse Debt and are allocable to an increase in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(2).

1.32. "**Membership Interest**" or "**Interest**" means an ownership interest in the LLC, which includes a Member's Economic Interest, the right to Vote or participate in the management of the LLC, and the right to information concerning the affairs and Business of the LLC as provided in this Agreement and under the NRS. The Membership Interest of a Member (including the Economic Interest) constitutes the personal property of the Member. No Member, by virtue of his ownership of a Membership Interest, has or owns, or is deemed to have or own, an interest in all or any part of the LLC's Property.

1.33. "**Net Capital Contribution**" means a Member's Capital Contribution, as of any date, REDUCED BY all prior distributions of a Member's Capital pursuant to Article 5 and/or Article 10 hereof.

1.34. "**Net Profit(s)**" and "**Net Losses(es)**" mean, for each Fiscal Year or other period, an amount equal to the LLC's taxable income or loss for such year or period, determined in accordance with Code section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

1.34.1. Any income of the LLC that is exempt from Federal income tax and not otherwise taken into account in computing Net Profits or Net Losses shall be added to such taxable income or loss;

1.34.2. Any expenditures of the LLC described in Code section 705(b)(2)(B) or treated as Code section 705(b)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profits or Net Losses shall be subtracted from such taxable income or loss;

1.34.3. Gain or loss resulting from any disposition of Property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the fair market value of the Property disposed of, notwithstanding that the adjusted tax basis of such Property differs from its fair market value;

1.34.4. In lieu of depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period, computed in accordance with the subsection hereof entitled "Depreciation"; and

1.34.5. Notwithstanding any other provision of this subsection, any items of income, gain, loss or deduction that are specifically allocated shall not be taken into account in computing Net Profits or Net Losses.

1.35. "**NRS**" means Chapter 86, Sections 86.011 to 86.590, of the Nevada Revised Statutes, as amended, or any corresponding provision or provisions of any succeeding law.

1.36. "**Percentage Interest(s)**" means a fraction, expressed as a percentage, the numerator of which is the number of Units owned of record by a Member and the denominator of which is the aggregate number of all issued and outstanding Units of the Members at the time of the calculation. The Percentage Interests of the Members shall be set forth on **EXHIBIT A** attached hereto and made a part of this Agreement, which exhibit may be amended and modified from time to time by the Manager without the consent of the Members.

1.37. "**Person**" means an individual, partnership, limited partnership, corporation, trust, estate, association, limited-liability company, or other entity, whether domestic or foreign.

1.38. "**Principal**" means the Person that is in ultimate control of a Member.

1.39. "**Priority Return**" means the priority return to each of the Class A Members, the Class B Members and the Class C Members of an accrued cumulative return on each of their respective Net Capital Contributions in an amount equal to FIFTEEN PERCENT (15%) per annum, accruing cumulatively from the date of contribution of the LLC, but not compounded, pro rated for any period which is a partial year.

1.40. "**Property**" means all or any personal property and other assets of the LLC, both tangible and intangible, including, but not limited to, the Technology (defined below), or any portion thereof.

1.41. "**Regulations**" or "**Treasury Regulations**" means the federal income tax regulations promulgated by the Treasury Department under the Code, as such regulations may be amended from time to time. All references herein to a specific section of the Regulations shall be deemed also to refer to any corresponding provisions of succeeding Regulations.

1.42. "**Revaluation Event**" means any of the following occurrences: (1) the contribution of cash or other property (other than a *de minimis* amount) by a new or existing Member to the capital of the Company as a consideration for the issuance of Additional Units; or (2) the distribution of cash or Property (other than a *de minimis* amount) to a Member in exchange for an Interest in the Company; provided that such event shall not constitute a Revaluation Event if the Management Committee reasonably determines that it is not necessary to adjust the book basis of Property or the Members' Capital Accounts in connection with the occurrence of any such event. The intent of this provision is to comply with the provisions of Regulations Section 1.704-1(b)(2)(iv)(f) and shall be interpreted consistently therewith.

1.43. "**Reserves**" means funds set aside from Capital Contributions or revenues as reserves. Such Reserves shall be maintained in amounts reasonably deemed sufficient by the Management Committee for working capital and the payment of taxes, insurance, debt service, repairs, replacements renewals, or other costs or expenses incident to the Business of the LLC, or in the alternative, the Dissolution of the LLC.

1.44. "**Secretary of State**" means the Secretary of State of the State of Nevada.

1.45. "**Unit(s)**" means a unit of Membership Interest as a Class A Member, a Class B Member or a Class C Member in the LLC.

1.46. "**Unit Option Plan**" shall have the meaning set forth in Section 3.8.

1.47. "**Unit Value**" shall have the meaning set forth in Section 3.11.

1.48. "**Vote**" means, except where superseded by another section of this Agreement, or as may be required under the applicable provisions of the NRS, the Code or applicable Regulations thereunder, the votes of the Class A Members, whether by ballot, written consent or a voice vote, wherein each Class A Member shall have and cast a number of votes equal to that Class A Member's Percentage Interest.

## ARTICLE 2
## INTRODUCTORY MATTERS

2.1. **Formation of the LLC; Adoption of Agreement.** The LLC was legally organized pursuant to Sections 86.151 and 86.201.1 of the NRS by executing, acknowledging and filing the Articles of Organization and the certificate of acceptance of the resident agent with the Secretary of State, and paying the required filing fees therefor. The Members executing this Agreement and any Persons who in the future become bound by this Agreement hereby adopt this Agreement as the Operating Agreement of the LLC.

2.2. **Name.** The name of the LLC is "**eTreppid Technologies, LLC**." The Members shall operate the Business of the LLC under such name or use such other or additional names as the Members may deem necessary or desirable, provided all such name or names shall be in compliance with the NRS and other applicable laws.

2.3. **Principal Business Office.** The LLC shall maintain its principal business office at 590 LAKESHORE BOULEVARD, INCLINE VILLAGE, NEVADA 89451, with a mailing address of P.O. BOX 4964, INCLINE VILLAGE, NEVADA 89450, or any other location as determined from time to time by the Management Committee.

2.4. **Resident Agent; Registered Office.** The name and address of the LLC's resident agent upon whom process may be served, or a notice or demand authorized by law to be served upon the LLC may be served, is GKL RESIDENT AGENT/FILINGS, INC., a Nevada corporation, whose street address in Nevada is 1100 EAST WILLIAM STREET, SUITE 207, CARSON CITY, NEVADA 89701, and whose mailing address is P.O. BOX 3679, CARSON CITY, NEVADA 89702. The registered office of the LLC in Nevada shall be the address of the LLC's resident agent. The location of the LLC's registered office or the name and address of its resident agent, or both, may only be changed by filing a certificate of change with the Secretary of State in the form and manner required by such office.

2.5. **Perpetual Existence.** As set forth in the Articles of Organization of the LLC, the LLC shall have perpetual existence, until the LLC is terminated or dissolved in accordance with this Agreement. The existence of the LLC shall commence as of the effective date of this Agreement, SEPTEMBER 28, 1998.

2.6. **Purpose and Business of the LLC.** The purpose and business of the LLC shall be to develop, patent, distribute, license and exploit in any manner and on a worldwide basis that certain software compression technology owned by the LLC (the "**Technology**") and to finance any and all of the foregoing activities (collectively, the "**Business**"). The LLC may conduct or engage in any other lawful activity that the LLC deems is necessary, incidental to or desirable in connection with the Business of the LLC.

2.7. **No Individual Authority of a Member or Committee Member.** No Member or Committee Member, acting alone or with the Manager, any other Committee Member, officer or

other non-manager Member, shall have the authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of the LLC.

2.8. **Title to Property in the Name of the LLC.** All Property owned by the LLC shall be held and owned and conveyance made in the name of the LLC. All agreements, documents, certificates and other instruments providing for the acquisition or other disposition of Property of the LLC shall be valid and binding upon it, except as otherwise provided herein, if approved by the Management Committee and executed by the President of the LLC as provided for herein.

2.9. **Maintenance of Company Minute Book; Record Keeping Duties.** The Manager (or the Secretary, if one is appointed by the Management Committee) shall keep and maintain or cause to be kept and maintained a company minute book to include the Articles of Organization of the LLC and this Agreement, and any amendments thereto, and minutes of all meetings (or consents in lieu of meetings) of the Management Committee, written consents of the Members, and other important documents of the LLC.

## ARTICLE 3
## MEMBERS, CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

3.1. **Names, Addresses and Classes of the Members.** The complete names, addresses and classes of the Members of the LLC are set forth on **EXHIBIT A** attached hereto and made a part of this Agreement, which exhibit may be amended or modified from time to time without the consent of the Members.

3.2. **Member Capital Contributions.** All Capital Contributions of the Members shall be set forth on **EXHIBIT A** attached hereto and made a part of this Agreement, which exhibit may be amended or modified from time to time without the consent of the Members. The Members' Capital Contributions shall be in exchange for Units in the LLC as set forth on **EXHIBIT A** attached hereto.

3.3. **Additional Capital Contributions and LLC Loans.** In the event the Management Committee determines that additional funds are required for the operation of the Company (including capital expenditures and debt service), the Management Committee may call for additional Capital Contributions from the Members (the "Additional Capital Contributions"). Any call for Additional Capital Contributions shall be by written notice to the Members setting forth the amount of Additional Contributions needed and the date by which the Members shall contribute, which date shall not be sooner than ten (10) days of receipt of such notice. Additional Capital Contributions shall be pro rata based on the Members' respective Percentage Interests. Each Member shall have the right, but not the obligation, to make an Additional Capital Contribution at the time specified in the Management Committee's notice. If any Member does not make the full amount of a requested Additional Capital Contribution, the Management Committee may elect any one, or any combination of, the following options:

3.3.1. The other Members shall have the right to make the contribution requested from the non-contributing Member on a pro rata basis (based on the contributing Members' relative