Percentage Interests) or as they otherwise agree. If Additional Capital Contributions are made by some, but not all Members, no distribution of Distributable Cash or any return of Capital Contributions shall be made to any non-contributing Member until an amount equal to One Hundred Fifty Percent (150%) of such Additional Capital Contributions are returned to those Members who made such Additional Capital Contributions.

3.3.2.    The Class A Members shall have the right to make the Additional Capital Contribution requested from the non-contributing Member on a pro rata basis (based on the contributing Class A Members' relative Percentage Interests) or as they otherwise agree; or

3.3.3.    If no other Class A Member makes the Additional Capital Contribution requested from the non-contributing Member, then the Class B Members shall have the right to make the Additional Capital Contribution requested from the non-contributing Member on a pro rata basis (based on the contributing Class B Members' relative Percentage Interests) or as they otherwise agree.

In the case of either Section 3.3.2 or 3.3.3 above, the Company shall issue to each contributing Member the number of Units determined by dividing (i) the amount of cash or the Gross Asset Value of other Property contributed by such contributing Member by (ii) the Unit Value, as determined by the Management Committee in connection with such requests for Additional Capital Contributions.

If the Management Committee determines that the Company needs additional funds, but determines not to request Additional Capital Contributions therefor, the Management Committee may cause the Company to sell additional Units pursuant to Section 3.8 below or borrow such funds from any Person, including any Member or Members, upon such terms and conditions as may be agreed to at the time. No such loan to the Company from a Member shall be deemed to constitute a Capital Contribution and shall not increase the Capital Account(s) of the Member(s) making the loan.

None of the terms, covenants, obligations or rights contained in this Section 3.3 is or shall be deemed to be for the benefit of any Person, other than the Members and the Company, and no such third Person shall under any circumstances have any right to compel any actions or payments by the Management Committee and/or the Members.

3.4.    **Rights With Respect to Capital.**

3.4.1.    **LLC Capital.**  No Member shall have the right to withdraw or receive any return of its Capital Contribution, and no Capital Contribution may be returned in the form of Property other than cash, except as specifically provided herein.

3.4.2.    **No Interest on Capital Contributions.**  Except as expressly provided for in this Agreement, no Capital Contribution of any Member shall bear any interest or otherwise entitle the contributing Member to any compensation for use of the contributed capital.

3.4.3. **Establishment of Capital Accounts.** A separate Capital Account shall be established and maintained for each Member. For record keeping purposes, each Member's Capital Account will be separated into a contribution account and an income (loss) account and will be maintained according to generally accepted accounting principles. Sections 3.5 and 3.6 below describe the appropriate accounting treatment for tax purposes of the Capital Accounts.

3.4.4. **No Payment of Salaries or Draws.** No Member shall receive or be entitled to receive any payment of salaries or draws with respect to its Capital Contribution or the balance in its Capital Account or for services rendered on behalf of the LLC or otherwise in its capacity as a Member of the LLC, except as expressly provided for in this Agreement.

3.5. **General Rules for Determining Capital Accounts.** The Capital Account of each Member shall be determined as follows:

3.5.1. **Increases.** The Capital Account of a Member shall be increased by:

3.5.1.1. The amount of money contributed by such Member to the Company;

3.5.1.2. The Gross Asset Value of property contributed by such Member (net of liabilities secured by such contributed property that the LLC is considered to assume or take subject to under Code section 752);

3.5.1.3. All liabilities of the LLC assumed by such Member, excluding those provided for in Section 3.5.2.2 below;

3.5.1.4. All Net Profits of the LLC allocated to such Member pursuant to Article 4 or other items in the nature of income or gain specially allocated hereunder, and in each case, appropriately adjusted to take into account book and tax differences; and

3.5.1.5. Any increase resulting from a Revaluation Event

3.5.2. **Decreases.** The Capital Account of a Member shall be decreased by:

3.5.2.1. The amount of cash distributed to such Member;

3.5.2.2. The Gross Asset Value of all actual and deemed distributions of property made to such Member pursuant to this Agreement (net of liabilities secured by such distributed property that the Member is considered to assume or take subject to under Code section 752);

3.5.2.3. All liabilities of the Member assumed by the LLC, excluding those provided for in Section 3.5.1.2 above;

3.5.2.4. All Net Losses of the LLC allocated to such Member pursuant to Article 4 or other items in the nature of loss or deduction specially allocated hereunder, and in each case, appropriately adjusted to take into account book and tax differences; and

3.5.2.5.  Any decrease resulting from a Revaluation Event.

### 3.6.  **Special Rules With Respect to Capital Accounts.**

3.6.1.  **Time of Adjustment for Capital Contributions.** For purposes of computing the balance in a Member's Capital Account, no credit shall be given for any Capital Contribution that such Member is to make until such contribution is actually made.  For purposes of this Agreement, the term "**Capital Contribution**" means the total amount of cash and/or the Gross Asset Value (net of liabilities) of property initially contributed or obligated to be contributed to the LLC by that Member and any subsequent contributions of cash and/or the Gross Asset Value (net of liabilities) of any other property subsequently contributed or obligated to be contributed to the LLC by that Member, including Additional Capital Contributions.

3.6.2.  **Intent to Comply With Treasury Regulations.** The foregoing provisions of Sections 3.4 and 3.5 and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations Section. To the extent such provisions are inconsistent with such Regulations Section or are incomplete with respect thereto, Capital Accounts shall be maintained in accordance with such Regulations Section.

3.7.  **Transferee's Capital Account.** In the event a Member transfers his Units in accordance with the terms of this Agreement, the transferee Member shall succeed to the Capital Account of the transferor Member to the extent it relates to the transferred Units in accordance with Regulations Section 1.704-1(b)(a)(iv).  In the event of a transfer of an Economic Interest, the transferee shall not succeed to any portion of the Capital Account of the transferor.

3.8.  **Additional Units.** By approval of the Management Committee, the Company is authorized to raise additional capital for any purpose by offering and selling Units to any Person under the terms and conditions and at such Unit Value approved by the Management Committee (the "Additional Units").  If approved by the Management Committee, the Company may also offer Additional Units to employees, to any class of Members, Economic Interest holders, Managers, officers, consultants, and advisors pursuant to any Unit option plan (or any Unit option agreement outside of a plan) or restrictive Unit purchase agreement or any other equity incentive plan adopted by the Management Committee (a "Unit Option Plan").

### 3.9.  **Preemptive Rights.**

3.9.1.  **Right of First Refusal.** The Company hereby grants to each Member the right of first refusal to purchase his pro rata share (as determined by relative Percentage Interests) of all or any part of any Additional Units which the Company may from time to time propose to sell or issue, other than the initial issuance of Class C Units and any Additional Units which are set aside, sold or issued under any Unit Option Plan adopted by the Management Committee and which do not exceed ten percent (10%) of the issued and outstanding Units.

3.9.2.  **Notice.** In the event the Company proposes to undertake an issuance of Units, it shall give each Member written notice of its intention, describing the type of Units and the price and terms upon which the Company proposes to issue the same.  Each Member shall have fifteen

(15) days from the date of receipt of any such notice to agree to purchase up to the Member's respective pro rata share (as determined by relative Percentage Interests) of such Units for the price and upon the terms specified in the notice by giving written notice to the Company and stating therein the quantity of Units to be purchased.

      3.9.3. **Assignment of Rights of First Refusal; Limitation.** The right of first refusal set forth in this Section 3.9 is not assignable. No Member shall have any rights under this Section 3.9 for any issuance of Units or Economic Interests by the Company under the Original Agreement, the Restated Agreement or the Amended Agreement prior to the date hereof.

    3.10. **Limitations on Liability and Obligations of the Members and Mangers.** Except for a Member's liability to the LLC pursuant to NRS Section 86.391, and the rights of judgment creditors to charge a Member's Economic Interest for certain unsatisfied judgments of a Member pursuant to NRS Section 86.401, and unless otherwise provided for in an agreement signed by a Member, the Manager or Committee Member to be charged, no Member, Manager or Committee Member shall be individually liable under a judgment, decree or order of court, or in any other manner, for any debt, obligation or liability of the LLC whether or not that liability or obligation arises in contract or tort. No Member shall be required to loan any funds to the LLC, except as provided for in this Agreement. No Member shall be required to make any contribution to the LLC by reason of any negative balance in his Capital Account, nor shall any negative balance in a Member's Capital Account create any liability on the part of the Member to any third party.

    3.11. **Unit Value.** Upon the occurrence of any Revaluation Event, the value of the Units (the "**Unit Value**") shall be the value of all issued and outstanding Units (without giving effect to (i) any options to acquire Units that may be outstanding from time to time or (ii) any distributions or contributions giving rise to the Revaluation Event) divided by the number of Units then issued and outstanding (without giving effect to any Units issued or to be issued in consideration of any contributions giving rise to the Revaluation Event). After the Unit Value has been so determined, each Member's Capital Account shall be adjusted in accordance with Section 3.5, based on such Unit Value. The Management Committee shall use commercially reasonable efforts to establish the fair value of the Units in accordance with this Section 3.11.

## ARTICLE 4
## ALLOCATION OF NET PROFITS AND NET LOSSES

    4.1. **Allocation of Net Profits and Net Losses.** Except as otherwise provided in this Article 4, Net Profits and Net Losses of the LLC in each Fiscal Year shall be allocated among the Members as set forth in Sections 4.1.1 and 4.1.2 below.

      4.1.1. **Net Profits.** Net Profits shall be allocated among the Members as follows:

        4.1.1.1. First, Net Profits shall be allocated among the Members in the proportion in which the Members shared in the Net Losses until an amount of cumulative Net Profits has been allocated equal to the total of cumulative Net Losses previously allocated to the Members.

4.1.1.2.  Second, an amount of Net Profits equal to the aggregate Priority Return, which has not been previously allocated to the Class A Members and Class C Members entitled to a Priority Return pursuant to this Section 4.1.1.2 shall be allocated, pro rata, to the Class A Members and the Class C Members in accordance with their respective Net Capital Contributions.

4.1.1.3.  Third, an amount of Net Profits equal to the aggregate Priority Return, which has not been previously allocated to the Class B Members, entitled to a Priority Return pursuant to this Section 4.1.1.3 shall be allocated, pro rata, to the Class B Members in accordance with their respective Percentage Interests.

4.1.1.4.  Thereafter, Net Profits shall be allocated among the Members in accordance with their respective Percentage Interests.

4.1.2.  **Net Losses.**  Except as otherwise provided in this Article 4, Net Losses shall be allocated among the Members as follows:

4.1.2.1.  First, Net Losses shall be allocated among the Members in the proportion in which the Members shared in the Net Profits until an amount of cumulative Net Losses has been allocated equal to the total cumulative Net Profits previously allocated to the Members.

4.1.2.2.  Second, pro rata, to FRIENDLY CAPITAL PARTNERS, L.P. ("FCP") and WARREN TREPP, AS TRUSTEE OF THE FREMONT TRUST ("FREMONT"), as Class A Members, in proportion to their positive balances, if any, in their respective Capital Accounts, until their respective Capital Account balances are reduced to zero.

4.1.2.3.  Third, to DENNIS MONTGOMERY and BRENDA K. MONTGOMERY, as Trustees of the MONTGOMERY FAMILY TRUST (the "MONTGOMERY TRUST"), as a Class A Member, in proportion to its positive balance, if any, in its Capital Account, until its Capital Account balance is reduced to zero.

4.1.2.4.  Fourth, Net Losses shall be allocated to the Class B Members and Class C Members in proportion to the positive balances, if any, in the Members' respective Capital Accounts, until such balances are reduced to zero.

4.1.2.5.  Thereafter, Net Losses shall be allocated to the Members in proportion to the positive balances, if any, in the Members' respective Capital Accounts, until such balances are reduced to zero.

The Members intend that the allocations provided for in this Section 4.1 shall result in the parties obtaining distributions over the life of the LLC (including upon liquidation) which will be identical to those provided for in Section 5.2 hereof, and will also result in the parties' adjusted Capital Account balances upon liquidation being in proportion to those necessary to achieve such distributions were the LLC to make final liquidating distributions to the Members in accordance with their relative adjusted positive Capital Account balances. Accordingly, to the extent necessary to ensure that the allocations provided for in this Article 4 result in distributions over the life of the LLC which are identical to those provided for in Section 5.2 hereof, the Manager shall

make such adjustments to the allocations provided for in Article 4 as are reasonably necessary to achieve the foregoing result.

     4.2.   **Residual Allocations.** Except as otherwise provided in this Agreement, all items of LLC income, gain, loss, deduction, and any other allocations not otherwise provided for shall be divided between the Members in the same proportions as they share Net Profits or Net Losses, as the case may be, for the Fiscal Year.

     4.3.   **Qualified Income Offset.** If any Member unexpectedly receives any adjustments, allocations or distributions described in clauses (4), (5) or (6) of Regulations Section 1.704-1(b)(2)(ii)(d), items of LLC income shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or distributions as quickly as possible. This Section 4.3 is intended to constitute a "qualified income offset" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(d)(3).

     4.4.   **Minimum Gain Chargeback.** If there is a net decrease in LLC Minimum Gain during a Fiscal Year, each Member will be allocated, before any other allocation under this Article 4, items of income and gain for such Fiscal Year (and if necessary, subsequent years) in proportion to and to the extent of an amount equal to such Member's share of the net decrease in LLC Minimum Gain determined in accordance with Regulations Section 1.704-2(g)(2). This Section 4.4 is intended to comply with, and shall be interpreted consistently with, the "minimum gain chargeback" provisions of Regulations Section 1.704-2(f).

     4.5.   **Member Nonrecourse Debt Minimum Gain Chargeback.** Notwithstanding any other provision of this Article 4, but except Section 4.4, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year of the LLC, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of LLC income and gain for such year (and, if necessary, subsequent years) in an amount equal such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4). This Section 4.5 is intended to comply with a minimum gain chargeback requirement of that Section of the Regulations and shall be interpreted consistently therewith.

     4.6.   **Member Nonrecourse Deductions.** Any Member Nonrecourse Deductions for any Fiscal Year or other period shall be specially allocated to the Member who bears (or is deemed to bear) the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(2).

4.7.    **Special Allocations.** Any special allocations of items of Net Profits pursuant to Sections 4.4, 4.5 and 4.6 shall be taken into account in computing subsequent allocations of Net Profits pursuant to Section 4.1, so that the net amount of any items so allocated and the gain, loss and any other item allocated to each Member pursuant to Section 4.1 shall, to the extent possible, be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Article 4 if such special allocations had not occurred.

4.8.    **Fees to Members or Affiliates.** Notwithstanding the provisions of Section 4.1, in the event that any fees, interest, or other amounts paid to any Member or any Affiliate thereof pursuant to this Agreement or any other agreement between the LLC and any Member or Affiliate thereof providing for the payment of such amount, and deducted by the LLC in reliance on Code section 707(a) and/or Code section 707(c), are disallowed as deductions to the LLC on its federal income tax return and are treated as LLC distributions, then:

4.8.1.    The Net Profits or Net Losses, as the case may be, for the Fiscal Year in which such fees, interest, or other amounts were paid shall be increased or decreased, as the case may be, by the amount of such fees, interest, or other amounts that are treated as LLC distributions; and

4.8.2.    There shall be allocated to the Member to which (or to whose Affiliate) such fees, interest, or other amounts were paid, prior to the allocations pursuant to Section 4.1, an amount of gross income for the Fiscal Year equal to the amount of such fees, interest, or other amounts that are treated as LLC distributions.

4.9.    **Section 704(c) Allocation.** Any item of income, gain, loss, and deduction with respect to any property (other than cash) that has been contributed by a Member to the capital of the LLC and which is required or permitted to be allocated to such Member for income tax purposes under Code section 704(c) so as to take into account the variation between the tax basis of such property and its Gross Asset Value at the time of its contribution shall be allocated to such Member solely for income tax purposes in the manner so required or permitted. In the event the Gross Asset Value of any of the LLC's Property is adjusted in accordance with Section 1.20.2, subsequent allocations of income, gain, loss and deduction with respect to such Property shall take into account any variation between the adjusted basis of such Property for federal income tax purposes and its Gross Asset Value in the same manner as under section 704(c) and the Regulations promulgated thereunder. Any elections or other decisions relating to such allocations shall be made in any manner that reasonably reflects the purpose and intention of this Agreement. To the extent permitted by Regulations Section 1.704-1(b)(4)(i), all items of income, gain, loss and deduction for federal and state tax purposes shall be allocated in accordance with the corresponding book items.

## ARTICLE 5
## DISTRIBUTIONS OF AVAILABLE CASH FLOW

5.1.    **Distributions of Available Cash Flow.** Subject to Section 5.3 below, distributions from the LLC to the Members shall be made from time to time to the extent of Available Cash Flow as determined by the Management Committee. Prior to the determination of the amount of

distributions, provisions shall be made for all known reasonable obligations and liabilities of the LLC, whether or not such obligations and liabilities are due or contingent, except that provision need not be made for any portion of any LLC financing, the amount of which can be reasonably expected to be satisfied from the proceeds of the sale of the then remaining Property of the LLC.

5.2.    **Priority and Manner of Distributions to Members.** Subject to Section 5.3 below, all distributions of Available Cash Flow shall be made to the Members in the following priority and manner:

5.2.1.    First, pro rata, to the Class A Members and the Class C Members in accordance with the respective amounts of their accrued but undistributed Priority Return until they have received an amount equal to their undistributed Priority Return accrued through the date of such distribution.

5.2.2.    Second, pro rata, to the Class B Members in accordance with their respective Percentage Interests until they have received an amount equal to their undistributed Priority Return accrued through the date of such distribution.

5.2.3.    Third, pro rata, to the Class A Members and the Class C Members in accordance with their respective Capital Contributions until they have received an aggregate amount equal their respective Capital Contributions to the LLC.

5.2.4.    Forth, pro rata, to the Class B Members in accordance with their respective Percentage Interests until they have received an aggregate amount equal to their respective Capital Contributions to the LLC.

5.2.5.    Thereafter, pro rata, to the Members in accordance with their respective Percentage Interests.

5.3.    **Tax Distributions.** Except as otherwise may be prohibited by any agreements between the LLC and its lenders, within ninety (90) days after the conclusion of each Fiscal Year, the Management Committee shall determine and provide written notice to the Members of the amount (the "**Tax Liability Shortfall Amount**"), if any, by which (a) the aggregate federal and state tax liability (if any) incurred by the Members with respect to the net income of the LLC for such preceding Fiscal Year (which tax liability shall be determined by applying the highest effective individual tax rates then in effect for the Fiscal Year in question), exceeds (b) the aggregate distributions of Distributable Cash made by the LLC with respect to such Fiscal Year (including any distributions made to the Members with respect to the final fiscal quarter of such Fiscal Year). The Management Committee shall use all reasonable efforts to cause the LLC to distribute the Tax Liability Shortfall Amount to the Members in the time and manner required hereunder, including, but not limited to, borrowing on behalf of the LLC sufficient funds to enable the LLC to distribute such Tax Liability Shortfall Amount. Each such distribution shall be made to the Members as soon as practicable after such funds are available. It is the objective of the Members that while the Tax Liability Shortfall Amount will be determined at the end of each Fiscal Year, to the extent possible and subject to the foregoing, distributions will be made in respect thereof on a quarterly basis to facilitate the Members' ability to make quarterly estimated tax payments with respect to their net

income from the LLC. Distributions made pursuant to this Section 5.3 shall be taken into account in connection with any subsequent distributions under Sections 5.1 and 5.2 above so that, to the extent possible, the Members shall obtain distributions in the same order and priority they would have obtained if this Section 5.3 were not in this Agreement. At the end of each Fiscal Year as contemplated above, final adjustments shall be made to reflect the actual results of such Fiscal Year.

### ARTICLE 6
### MANAGEMENT OF THE LLC

6.1. **Management of the LLC.** Subject to the provisions of the NRS, the Articles of Organization and to any limitations set forth in this Agreement (as may be amended from time to time) relating to actions required to be approved by the Members, the Business and affairs of the LLC shall be managed, and all Company powers shall be vested in the Management Committee. The day-to-day operations of the LLC shall be implemented by one (1) Manager designated or appointed pursuant to Section 6.1.1 below, who shall act as the President of the LLC and shall conduct the Business in accordance with and subject to the policies, procedures, decisions and directives of the Management Committee.

6.1.1. **Designation of "Manager."** The Manager of the LLC shall be DOUGLAS J. FRYE, an individual, or his successor as appointed by the Management Committee pursuant to Section 6.1.2 below.

6.1.2. **Election of Successor Manager.** Upon the Manager's resignation from office or removal from office by the Management Committee, the Management Committee shall appoint a successor Manager.

6.1.3. **Subordinate Officers.** The Management Committee may, in its discretion, appoint a secretary, a chief financial officer, a chief technology officer, and such other officers of the LLC as the Business of the LLC may require, each of whom shall hold office for such period, have such authority and perform such duties as provided for in this Agreement or as the Management Committee may determine from time to time.

The Committee Members, as evidenced by their acknowledgment to this Agreement, hereby appoint DENNIS MONTGOMERY to the office of Chief Technology Officer to hold office until his resignation, removal or other disqualification from service, or until his successor has been duly appointed by the Management Committee in accordance with this Agreement.

6.1.4. **Management Committee.** The Management Committee shall consist of three (3) Committee Members. Each of the Class A Members, so long as they are Members, shall appoint one (1) Committee Member. Each Class A Member may appoint one or more alternates for the Committee Members appointed by it. An alternate shall have all the powers of the Committee Member in his absence or inability to serve. Each Committee Member may vote by delivering his proxy to another Committee Member. Each Class A Member shall have the power to remove any Committee Member appointed by it by delivering written notice of such removal to such Committee Member and to the other Committee Members. Vacancies on the Management Committee shall be

filled by the Class A Member who appointed the Committee Member previously holding the position that is then vacant.

The Class A Members executing this Agreement hereby appoint those persons set forth opposite their respective name below as their designated Committee Member to serve on the Management Committee of the Company, each of whom shall serve at the pleasure of the respective appointing Member and shall hold their respective offices until their resignation, removal or other disqualification from service, or until their respective successors have been duly appointed in accordance with this Agreement:

| Name of Appointing<br>Class A Member | Appointed<br>Committee Member |
|---|---|
| Friendly Capital Partners, L.P. | Douglas J. Frye |
| The Fremont Trust | Warren Trepp |
| Dennis Montgomery | Dennis Montgomery |

6.1.5.  **Management Committee Chairman**.  The Management Committee shall have a chairman (the "**Chairman**"), who shall be one of the Committee Members designated by a majority of the Committee Members.  The Chairman initially shall be WARREN TREPP, an individual, or his successor as appointed by the Management Committee in accordance with this Section 6.1.5.  The Chairman shall (i) preside at Management Committee meetings; (ii) have the authority to execute and deliver on behalf of and in the name of the LLC any agreements, contracts, notes, mortgages, evidence of indebtedness, certificates, statements, conveyances or other instruments in writing, and any assignment or endorsement thereof; and (iii) exercise such rights or perform such duties as are otherwise provided in this Agreement or as may be approved from time to time by the Management Committee.  The Chairman may only be removed from office by a majority of the Committee Members.  In the event the Chairman resigns or is removed, a majority of the Committee Members shall elect a replacement Chairman.

6.1.6.  **Delegation of Powers and Duties**.  The Management Committee may by written resolution from time to time delegate any of its powers to the Manager, the Chairman, officers, employees of a Member, or to any other Person.  Such delegation of powers may include, but not be limited to, the authority to execute and deliver on behalf of and in the name of the LLC any agreements, contracts, notes, mortgages, evidence of indebtedness, certificates, statements, conveyances or other instruments in writing, and any assignment or endorsement thereof.

6.1.7.  **Management Committee Meetings.**

6.1.7.1.  The Management Committee shall meet at least once each quarter in Incline Village, Nevada, or such other times or places as the Chairman shall determine (unless such meeting shall be waived by all Committee Members) or on the call of the Chairman or the Manager.  Such meetings shall be called upon at least ten (10) days prior written notice, except in the case of an emergency, in which event such a meeting may be called upon prior notice as the Chairman deems appropriate, but in no event less than forty-eight (48) hours.  An agenda for each meeting shall be prepared in advance by the Chairman or the Manager, as the case may be, and circulated to

the Committee Members. Approval of the Management Committee shall require a majority in number of the Committee Members. The Management Committee may act without a meeting if (i) the action taken is approved in writing by the number of Committee Members necessary to take such action, and (ii) written notice of such action is given to the Committee Members who did not provide such written consent. Written minutes of all meetings shall be maintained, and the minutes for each meeting shall be approved at a subsequent meeting of the Management Committee.

6.1.7.2. The Management Committee may adopt whatever rules and procedures relating to its activities as it may deem appropriate, provided that such rules and procedures shall not be inconsistent with or violate the provisions of this Agreement, and provided that such rules and regulations shall permit meetings by telephone, video conferencing or the like, and shall permit Committee Members to participate in meetings by telephone or video conference or the like or by written proxy, and such participation shall be deemed attendance for purposes of determining whether a quorum is present.

6.1.8  **Liability for Certain Acts**. The Manager and the Committee Members shall perform their managerial duties in good faith, in a manner they reasonably believe to be in the best interests of the LLC, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager or Committee Member who so performs the duties of Manager or Committee Member shall not have any liability by reason of being or having been a Manager or Committee Member of the LLC. A Manager or Committee Member shall not be liable to the LLC or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been proved by a non-appealable court order, judgment, decree or decision to be the result of fraud, deceit, gross negligence, willful misconduct, breach of a fiduciary duty, or a wrongful taking by the Manager or the respective Committee Member. Neither the Manager nor the Management Committee shall be liable for any loss or damage to the Company caused by strikes, labor troubles, riot, fires, explosions, tornadoes, floods, acts of a public enemy, insurrections, acts of God, failure to carry out the provisions hereof due to provisions of law or rules or regulations promulgated by any governmental agency or any other demand or requisition of any government, or from any other cause beyond the control of the Manager or the Management Committee. The Management Committee does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company

6.2.  **Powers, Duties and Responsibilities of the Management Committee.** The Management Committee shall have all of the rights, duties and powers as specified in this Agreement, including without limitation, the general powers and duties of management typically vested in the board of directors and the office of a chief executive officer of a corporation. Matters requiring the approval of the Management Committee shall include, without limitation, the following:

6.2.1.  The authorization, negotiation, execution and delivery on behalf of the LLC of any and all contracts or agreements, verbal or written, having a contract value or obligation amount of *more than* Fifty Thousand Dollars ($50,000.00), which are necessary or appropriate for the development or exploitation of the Technology or are in furtherance of the Business of the LLC, including, but not limited to, but expressly subject to the limitations requiring Member approval pursuant to Section 6.4 hereof, contracts or agreements between the LLC and/or its Affiliates or any other Person to provide the LLC with goods or services of any kind in which the LLC or its Manager

may have an actual or potential conflict of interest, and including any amendments or modifications thereto, or renewals or terminations thereof.

6.2.2. The approval, execution, delivery and performance on behalf of the LLC of the Montgomery Trust Contribution Agreement, and amendments or modifications thereto.

6.2.3. The approval of detailed line-item budgets for the operation of the LLC and its Business or for the development or exploitation of the Technology, and any amendments, modifications, supplements or renewals thereto. Each such budget (and any amendments thereto from time to time), after approval by the Management Committee, shall be referred to herein as an "**Approved Budget**."

6.2.4. Subject to the Approved Budgets, borrowing funds from any lender to operate or maintain the Business or for any other purpose which is in furtherance of the Business of the LLC, other than trade payables in the ordinary course of business; to issue evidences of indebtedness in connection therewith; to refinance, increase the amount of, modify, amend or change the terms of, or extend the time for the payment of, any indebtedness or obligation of the LLC; and to secure any indebtedness or obligation of the LLC by mortgage, pledge, granting a security interest in or other lien on the LLC's assets.

6.2.5. The appointment and termination of officers, hiring and firing of employees, or the engagement of contractors, subcontractors, consultants, experts and other Persons necessary or appropriate to carry out the Business of the LLC, including the selection and engagement of an independent certified public accounting firm and legal counsel for the LLC, and to approve the terms of any such appointment, employment or engagement, including approval of the terms and payment of compensation.

6.2.6. The approval of the amount and timing of any Additional Capital Contributions required by the LLC to conduct its Business, including, without limitation, all capital required to be expended with respect to the Technology.

6.2.7. Subject to the approval by the Members pursuant to Section 6.4.2 below, the sale, license, lease, rental, assignment, transfer or other disposition of all or any material part of the assets of the LLC, including the Technology and any patent rights thereto, whether as a single transaction or a series of transactions as part of a plan.

6.2.8. Any material decisions relating to the test marketing, manufacture, distribution, licensure or exploitation of the Technology.

6.3. **Powers, Duties and Responsibilities of the Manager.** The Manager shall act as the President of the LLC and shall be charged with the rights, duties and powers as specified in this Agreement, subject to the limitations set forth in this Article 6 and elsewhere in this Agreement. The Manager shall have responsibility for conducting the day-to-day operations of the Business and the LLC and for implementing the decisions and directives of the Management Committee in connection therewith, subject to the supervision, direction and control of the Management Committee

The Manager shall have the general powers and duties of management typically vested in the office of a chief operating officer of a corporation. Subject to the provisions and limitations set forth in Sections 6.2 and 6.4 hereof, the Manager shall have responsibility for the following matters (listed by way of example and not in limitation thereof) and shall have the authority on behalf of and in the name of the LLC to do or perform, or cause to be done or performed, such acts or things and to negotiate, execute, acknowledge and deliver all agreements, documents and instruments in connection therewith:

6.3.1. Prepare, execute and file on behalf of the LLC all applications (including patent applications), licenses, permits, registrations, and consents, and to otherwise communicate and deal with any and all governmental agencies having jurisdiction over, or in any way affecting, the Technology, the Business or any part thereof.

6.3.2. Make ordinary and necessary expenditures and incur reasonable obligations necessary for the conduct of the activities of the LLC's Business, all in accordance with and subject to Approved Budgets.

6.3.3. Authorize, negotiate, execute and deliver on behalf of the LLC any and all contracts or agreements, verbal or written, having a contract value or obligation amount of *less than* Fifty Thousand Dollars ($50,000.00), which the Manager deems are necessary or appropriate for the development or exploitation of the Technology, or are in furtherance of the Business, including, but not limited to, but expressly subject to the limitations requiring Member approval pursuant to Section 6.4 below, contracts or agreements between the LLC and/or its Affiliates or any other Person to provide the LLC with goods or services of any kind, in which the LLC or its Manager may have an actual or potential conflict of interest, and including any amendments or modifications thereto, or renewals or terminations thereof.

6.3.4. Subject to the prior approval by the Members pursuant to Section 6.4.2 below and the Management Committee pursuant to Section 6.2.7 above, the sale, license, lease, rental, assignment, transfer or other disposition of all or any material part of the assets of the LLC, including the Technology and any patent rights thereto, whether as a single transaction or a series of related transactions as part of a plan.

6.3.5. To confess a judgment against the LLC, or approve the filing of or settlement of any claims, including litigation matters, for or against the LLC, of less than Fifty Thousand Dollars ($50,000.00).

6.3.6. Execute and deliver bonds and indemnities by or on behalf of the LLC as may be required for the ownership and/or sale of any Property, as expressly directed to do so on a case-by-case basis by the Management Committee.

6.3.7. To purchase liability and other insurance to protect the Technology, the Property and Business of the LLC.

6.3.8.   The Manager, subject to the reasonable approval of the Management Committee, shall select technical engineers, programmers and other computer technicians to develop or exploit the Technology.

6.3.9.   From time to time, amend EXHIBIT A to this Agreement to reflect any change in the information contained therein, and prepare, execute and file a Certificate of Amendment or Correction to the Articles of Organization to reflect any change or correction in the LLC, its Manager, Members, principal office, registered agent, or the latest date upon which the LLC may be dissolved.

6.3.10. Prepare, execute and file on behalf of the LLC the Annual List of Managers, Members and Agent with the Secretary of State and to pay all filing fees therefor.

6.3.11. As directed from time to time by the Management Committee, to invest the funds of the LLC in bank certificates of deposit, short-term government securities or other short-term securities, including money market funds, prior to the expenditure of such capital in connection with Business operations

6.3.12. If the Manager deems it necessary or appropriate, to adopt a Company seal, circular in form containing the words "eTreppid Technologies, LLC," together with the date of formation of the LLC, and such other information as shall be appropriate for banking and other Business purposes.

6.3.13. Maintain a minute book to include the Articles of Organization of the LLC, this Agreement and any amendments or supplements hereto, and the minutes of meetings (or consents in lieu of meetings) of the Management Committee, written consents of the Members, and other important documents of the LLC.

6.4.   **Limitations on the Management Committee and Manager.** Neither the Management Committee nor the Manager shall have the authority to do any of the following without the prior Vote of a Majority in Interest of the Members:

6.4.1.   Except for the limited authority of the Manager to amend **EXHIBIT A** hereto and the Articles of Organization pursuant to Section 6.3.9 above, materially amend or restate this Agreement or the Articles of Organization, in whole or in part, including any increase in the number of Committee Members of the LLC pursuant to Section 6.1 above.

6.4.2.   Sell, license, lease, rent, transfer, assign or otherwise dispose of all or substantially all of the assets of the LLC, including the Technology or any patent rights thereto, whether in a single transaction or a series of related transactions as part of a plan.

6.4.3.   Approve the Transfer of a Member's Interest (except for the Transfer of up to 10% of a Member's Economic Interest pursuant to Section 8.1.3 hereof).

6.4.4. Approve any transaction involving the payment of compensation by the LLC to a Member or an Affiliate of a Member, unless otherwise expressly authorized and approved pursuant to this Agreement.

6.4.5. Any merger, consolidation, divestiture or dissolution and winding up of the Business and affairs of the LLC.

6.4.6. Any material change in the character of the Business of the LLC.

6.4.7. The admission of new or Substitute Members (defined herein) to the LLC.

6.4.8. Any act in contravention of this Agreement or any valid amendment hereto, the Articles of Organization or any amendment thereof.

6.4.9. Knowingly perform any act (other than any act required by this Agreement or by law or an act taken in good faith) that would, at the time of such act, subject any Member of the LLC to any personal liability in any jurisdiction.

6.5. **Time Devoted to Management.** Unless otherwise determined by the Management Committee to be in the best interests of the LLC and its Members, the Manager's services shall be nonexclusive to the LLC. The Manager needs to devote only such time and attention to the Business and affairs of the LLC as he shall deem necessary and appropriate, in the exercise of his own reasonable judgment. The Manager may be required to travel from time to time in furtherance of his duties and responsibilities hereunder.

Unless an alternative schedule is determined from time to time by the Management Committee to be in the best interests of the LLC and its Members, the services of DENNIS MONTGOMERY, an individual ("MONTGOMERY"), so long as he is serving as a Committee Member and/or Chief Technology Officer pursuant to this Agreement, shall be exclusive to the LLC, and he shall devote substantially all of his full time and attention and efforts to the Business and affairs of the LLC during reasonable business hours. MONTGOMERY may be required to travel from time to time in furtherance of his duties and responsibilities hereunder. MONTGOMERY agrees, as acknowledged by his signature to this Agreement, that he shall provide his services in a manner consistent with the policies of the LLC as may be adopted from time to time by the Management Committee.

6.6. **Restriction on Independent Activities; Agreement Not to Compete.** So long as MONTGOMERY is appointed as a Committee Member and/or as Chief Technology Officer pursuant to this Agreement, MONTGOMERY and his Affiliates agree that, during the term of this Agreement, none of them shall compete with the LLC, whether for their own account and/or for the account of others, individually, jointly with others, or as a part of any other limited liability company, limited partnership, general partnership, joint venture, corporation or other entity, by: (i) developing, licensing or exploiting in any manner any software programs or other technology which is competitive with the Technology or the Business of the LLC, or providing any services or supplies which are encompassed within the definition of the "Business" of the LLC as set forth in this Agreement; (ii) purchasing or otherwise acquiring, owning, holding, operating, managing, investing

in or otherwise disposing of a like business of the LLC's Business and interests therein of any kind or nature; or (iii) otherwise engaging in any or all aspects of a like business of the LLC's Business. MONTGOMERY's or his Affiliates' participation in any of the activities restricted by this paragraph shall be deemed a breach of his duties and obligations as a Committee Member hereunder.

### 6.7. Compensation to Management or Members.

6.7.1. **Manager's Compensation**. The Manager shall not receive compensation for his services hereunder, unless otherwise approved by the Management Committee.

6.7.2. **Officers' Compensation**. Except for any compensation to be paid to the Chief Technology Officer as set forth below, no officer of the LLC shall receive compensation for his or her services unless otherwise approved by the Management Committee. In consideration for his full-time exclusive services to the LLC, MONTGOMERY, as Chief Technology Officer, shall receive, in addition to any reimbursement for costs as provided for in Section 6.8 below, a Guaranteed Payment (as that term is defined in section 707(c) of the Code). The payment, amount and term of such Guaranteed Payment or other compensation to be paid to MONTGOMERY as Chief Technology Officer for his services shall be established, adjusted, renewed or terminated by the Management Committee from time to time.

6.7.3. **Members' Compensation**. Except as expressly permitted by this Agreement or any other written agreement, the LLC shall pay no compensation to any Member or any Principal of any Member for their services as a Manager to the LLC.

6.8. **Expense Reimbursements.** The LLC shall reimburse the Manager, officers, Committee Members, Members or their Affiliates for any expense paid by them on behalf of the LLC, that is to be properly borne by the LLC, as provided for in an Approved Budget or as otherwise approved from time to time by the Management Committee.

6.9. **Restrictions on Distributions**. No distribution to the LLC's Members is valid unless the Management Committee has approved such distribution either immediately before or immediately after such distribution.

6.10. **Rights of Inspection.** The Manager and Committee Members shall have the absolute right at any reasonable time to inspect and copy all books, records and documents of every kind, and to inspect the physical properties of the LLC and also of its subsidiary limited liability companies, domestic or foreign. Such inspection by the Manager or any Committee Member may be made in person or by agent or attorney and includes the right to copy and obtain abstracts.

6.11. **Furnishing LLC Information.** The Manager may release such information concerning the Business and operations of the LLC to such sources as is customary or required by law or by rule or regulation or order of any regulatory body.

6.12. **Authority to Settle with IRS.** If there are more than one hundred (100) Members of the LLC, the "Tax Matters Manager" (as appointed in Section 9.4 below) shall have the authority to enter into a settlement with the Internal Revenue Service on behalf of those Members having less

than a ONE PERCENT (1%) interest in the profits of the LLC, except where a Member files a statement with the IRS, in accordance with applicable Treasury regulations, stating that the Tax Matters Manager has no such authority to act on that Member's behalf. Any Member filing such a statement with the IRS shall notify the Manager thereof within thirty (30) days of such filing.

## ARTICLE 7
## MEMBERS' MEETINGS; ACTIONS WITHOUT MEETINGS

7.1.    **Meetings.** The Members shall not be required to hold any regular, annual or special meetings in order to approve any action of the LLC as required by this Agreement or the NRS.

7.2.    **Actions Without a Meeting.**

7.2.1.    Any action requiring approval of the Members pursuant to this Agreement may be approved without the conduct of a meeting and without prior notice if a written consent, setting forth the action or actions so taken, is signed by Members holding, in the aggregate, a Majority in Interest or more of the Members, unless a greater Vote is required under, or a lesser Vote is provided for in, this Agreement or the NRS.

7.2.2.    Unless the unanimous written consent of the Members has been given, notice of any such action approved by less than all of the Members shall be given to those Members who did not participate in or approve of such action within ten (10) days following the approval thereof.

7.2.3.    Any Member giving a written consent may revoke the consent by giving written notice to the LLC prior to the time that written consents of the Members holding, in the aggregate, the Vote required to authorize the proposed action have been filed with the LLC. Such revocation is effective only upon its receipt by the LLC.

7.3.    **Exclusion of Vote.** If, pursuant to the NRS or the terms of this Agreement, a Member is not entitled to Vote on a specific matter, then such Member's number of Votes shall not be considered for purposes of determining whether approval by Vote of the Members has been obtained in respect of such specific matter.

## ARTICLE 8
## RESTRICTIONS ON TRANSFER OF MEMBERSHIP INTERESTS; ADMISSION AND SUBSTITUTION OF NEW MEMBERS

8.1.    **Transfer or Assignment of Member's Interest.** The Interest of each Member and the Economic Interest of a Person who is not a Member constitutes the personal property of the Member or Economic Interest holder. No Member or Economic Interest holder has any interest in the Property of the LLC.

8.1.1.    A Member's Interest or an Economic Interest may only be transferred or assigned in strict accordance with this Agreement.

8.1.2. Except as otherwise provided in Sections 8.5.1 and 8.5.2 below, no sale, transfer, hypothecation, encumbrance or assignment (a "**Transfer**") of a Member's Interest or an Economic Interest in the LLC will be valid unless approved by a Management Committee, in its sole discretion.

8.1.3. Except for any Transfer of a Class A Member's Interest to another existing Class A Member of the LLC, upon the Transfer of any Class A Member's Interest (but not a transfer of an Economic Interest), the transferee shall automatically become a Class B Member and the Class A Units so transferred shall automatically be converted to Class B Units. Notwithstanding the foregoing, with the approval of the Management Committee, such converted Class B Units may maintain the allocation and distribution priority rights of a Class A Member pursuant to Sections 4.1.1.2, 5.2.1 and 5.2.3.

8.2. **Void Transfers.** Any Transfer of an Interest that does not satisfy the requirements of Section 8.1.2 above shall be null and void, shall not confer any rights upon the proposed transferee, and the transferring Member shall continue to be a Member of the LLC and to be obligated under each and every provision of this Agreement.

8.3. **Admission of New Members.** Subject to the approval of a Majority in Interest of the Members pursuant to Section 6.4.7 hereof, a new Member may be admitted into the LLC only upon approval by the Management Committee and upon satisfaction of the requirements set forth in this Section 8.3. The Management Committee shall determine the amount of Capital Contribution that must be made by a new Member. A new Member shall not be deemed admitted into the LLC until the Capital Contribution required of such Person shall have been made and such Person has become a party to this Agreement by executing and delivering to the LLC a counterpart signature page to this Agreement acknowledging his acceptance of, and agreeing to be bound by, the terms and conditions of this Agreement.

8.4. **Substitution of Members.** Upon the death of a Member or upon the valid Transfer of a Member's Units in accordance with Section 8.1.2 above, a Person may be substituted as a Member and admitted to the LLC, succeeding to all of the rights of any Member (a "Substitute Member"). The Substitute Member shall have all the rights and powers and shall be subject to all the restrictions and liabilities of the transferring Member, except that the substitution of the transferee Member shall not release the transferring Member from liability to the LLC pursuant to NRS Section 86.351. No Substitute Member shall be deemed admitted into the LLC until such Substitute Member has become a party to this Agreement by executing and delivering to the LLC a counterpart signature page to this Agreement, acknowledging his acceptance of, and agreeing to be bound by, the terms and conditions of this Agreement.

8.5. **Exceptions to the Restrictions on Transfer.**

8.5.1. The restrictions on Transfer contained in this Article 8 shall not apply to (1) a gift of all or any portion of a Member's Units by a Member to his spouse, child, or grandchild ("Family") or of a Transfer of all or any portion of such Interest by a Member to (i) a trust solely for the benefit of the Member or his Family or (ii) any other entity at least 80% of the value and voting power of which is owned (directly or indirectly) by such Member and his Family (except no such

transfers shall be made pursuant to any divorce or separation proceedings, unless the Management Committee has approved such Transfer); (2) a distribution from any Member that is a limited liability company or partnership to its members or partners (so long as such distribution does not occur within one year of such Member's purchase of the Interest being transferred and so long as all of such Members or partners are "accredited investors" as such term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended; or (3) any gift by will to any entity that qualifies as a charitable organization under section 501(c)(3) under the Code; provided, however, that such Interest shall remain subject to this Agreement and such transferee shall, as a condition to Transfer, agree in writing to be bound by the terms of this Agreement by the execution of a counterpart signature page to this Agreement.

8.5.2. One or more Transfers of up to an aggregate of ten percent (10%) of a Member's Economic Interest may be done without the consent of the other Members, the Manager or the Management Committee, provided that the transferring Member notifies the Manager in writing at least ten (10) days in advance of his intent to Transfer an Economic Interest. Such notice shall contain the date and amount of the transferred Economic Interest, and the name, address, facsimile number and taxpayer identification number of the transferee. The transferee of an Economic Interest shall not have any right to Vote, participate in the management of the Business and affairs of the LLC, or to become a Member. No rights as the holder of an Economic Interest shall be conferred upon the transferee until the transferee agrees to be bound by all of the terms and provisions of this Agreement. Notwithstanding the foregoing, any Transfer by a Member of an Economic Interest in excess of an aggregate of 10% shall be deemed a Transfer of such Member's Interest and shall be subject to Section 8.1.2 above.

8.5.3. Notwithstanding any right of Members, including rights of first refusal contained herein, if a Majority in Interest of the Members determines to sell the Company, whether by merger, consolidation, sale of all or substantially all of its assets, sale of all of the outstanding Units of the Company or otherwise to an nonaffiliated third party (an "Approved Sale"), all of the Members shall consent to and raise no objection against such Approved Sale (including refraining from exercising any rights of appraisal, if any) and shall take all necessary and desirable actions in their capacity as Members in connection with the consummation of such Approved Sale. The Members shall agree to sell their pro rata amount of Units which are subject to such Approved Sale on the terms and conditions as provided by a Majority in Interest of the Members. The obligations of the Members with respect to any Approved Sale are subject to the condition that, upon the consummation of such Approved Sale, all of the holders of Units will receive the same form and amount of consideration per Unit, or if any Members are given an option as to the form and amount of consideration to be received, all Members will be given the same option, on a pro rata basis, in accordance with their respective Percentage Interests.

8.6. **Requirements on Transfer**. Notwithstanding anything in this Article 8, no Member may Transfer any Interest (other than pursuant to an effective registration statement under the Securities Act) without first complying with the following:

8.6.1. Delivering to the Company upon its request an opinion of counsel addressed to the Company reasonably acceptable in form and substance to the Company that registration under

the Securities Act is not required in connection with such transfer and that such transfer is exempt from all applicable state securities laws; and

        8.6.2.  Every Person (including such Person's spouse, if any), other than the Company, to whom such Interest is transferred in compliance with this Article 8 shall be required to execute and deliver to the Company a counterpart signature page to this Agreement, acknowledging his acceptance of, and agreeing to be bound by, the terms and conditions of this Agreement and agreeing to become a party to this Agreement.  At the time of execution and delivery to the Company of such counterpart signature page, such Person shall be admitted as a Substitute Member.

## ARTICLE 9
## ADMINISTRATION AND ACCOUNTING MATTERS

        9.1.  **Maintenance of Books and Records.**  The LLC shall cause books and records of the LLC to be maintained in accordance with generally accepted accounting principles, and shall give reports to the Members in accordance with prudent business practices and the NRS.  The determination of the Management Committee as to adjustments to the financial reports, books, records and returns of the LLC, in the absence of fraud or gross negligence, shall be final and binding upon the LLC and all of the Members.  There shall be kept at the principal business office of the LLC, as well as at the registered office of the LLC specified in Section 2.5 (if different), any information required to be maintained by the LLC pursuant to NRS Section 86.241, as amended from time to time.

        9.2.  **Annual Accounting.**  Within one hundred twenty (120) days after the close of each Fiscal Year of the LLC, the LLC shall provide to the Members all information necessary for them to complete federal and state tax returns.

        9.3.  **Inspection and Audit Rights.**  Each Member, at its own expense, has the right, upon reasonable request and for purposes reasonably related to the Interest of that Member, to inspect and copy during normal business hours any of the LLC books and records required to be maintained in accordance with Section 9.1 above.  Such rights may be exercised by the Member or that Member's agent or attorney.

        9.4.  **Tax Matters Handled by Manager.**  The Management Committee shall designate a Person to be the LLC's "**Tax Matters Manager**" (defined as "Tax Matters Partner" in Code section 6231) to represent the LLC (at the LLC's expense) in connection with all examinations of the LLC's affairs by tax authorities, including resulting judicial and administrative proceedings, and to expend LLC funds for professional services and costs associated therewith.  In its capacity as "Tax Matters Manager," the designated Person shall oversee the LLC tax affairs in the overall best interests of the LLC.

        9.5.  **Establishment of Bank Accounts; Authorized Signatories.**  The Management Committee shall authorize the establishment of one or more depository accounts in Nevada and elsewhere for the funds of the LLC.  All disbursements from the LLC's bank accounts shall be in accordance with this Agreement.  Any checks, drafts, and other instruments obligating the LLC to pay money up to a maximum amount of Twenty-Five Thousand Dollars ($25,000.00), including

instruments payable to the Manager or other Persons authorized to sign them, may be signed on the LLC's behalf by the Manager, acting alone. Any such checks, drafts or other instruments obligating the LLC to pay money in excess of $25,000.00, whether as a single check or a series of checks, shall require the joint signatures of the Manager and a Person designated from time to time by the Management Committee.

Cash balances on hand may be invested by the Management Committee on behalf of the LLC as provided for in this Agreement. LLC funds shall not be commingled with the funds of the Manager, any Committee Member, Member, officer or any other Person or used as compensating balances for any other obligations of the Manager, any Committee Member, any Member, officer or any other Person.

9.6.    **Federal Income Tax Elections.** The Management Committee on behalf of the LLC may make all elections for federal income tax purposes, including but not limited to, the following:

9.6.1.    **Entity Classification Election.**    As a domestic eligible entity, the Management Committee shall cause the LLC to elect to be classified as a partnership for federal tax purposes by filing Form 8832, Entity Classification Election, with the Internal Revenue Service in the time and manner prescribed by the applicable regulations. The election for such classification shall be effective as of the date of filing the Articles of Organization.

9.6.2.    **Use of Accelerated Depreciation Methods.**    To the extent permitted by applicable law and regulations, the LLC may elect to use an accelerated depreciation method on any depreciable unit of the assets of the LLC.

9.6.3.    **Accounting Method.**    For financial reporting purposes, the books and records of the LLC shall be kept on the CASH METHOD OF ACCOUNTING applied in a consistent manner and shall reflect all transactions of the LLC and be appropriate and adequate for the purposes of the LLC.

9.6.4.    **Obligations of Members to Report Allocations.**    The Members are aware of the income tax consequences of the allocations made by this Agreement and hereby agree to be bound by the provisions of this Section 9.6 in reporting their shares of the LLC income and loss for income tax purposes.

9.6.5.    **Tax Year.**    The Management Committee will cause the LLC to adopt the CALENDAR YEAR as its taxable year.

9.6.6.    **Other Elections.**    The Management Committee shall have the right in its sole discretion at any time to make or not to make such other elections as are authorized or permitted by any law or regulation for income tax purposes (including, but not limited to, any election under sections 734, 743 and 754 of the Code to adjust the basis of the Property of the LLC in the event of a Transfer of all or part of the Interest of any Member). Notwithstanding the above, no Member, nor the LLC, shall make an election to be excluded from the application of Subchapter K of the Code or any similar provisions of state law.

## ARTICLE 10
## TERMINATION AND DISSOLUTION

10.1    **Dissolution.** Pursuant to NRS Section 86.491, the LLC shall be dissolved and its affairs wound up upon the occurrence of any of the following events:

10.1.1.    The affirmative Vote by a Majority in Interest of the Members; or

10.1.2.    The sale, license, lease, rental, assignment or other disposition of all or substantially all of the assets of the LLC, including the Technology or any patent rights thereto, whether occurring in a single transaction or a series of related transactions as part of a plan; or

10.1.3.    Upon entry of a decree of judicial dissolution pursuant to the applicable provisions of the NRS.

10.2    **Continuation and Conduct of Business After Dissolution.** Upon the occurrence of any dissolution event specified in Section 10.1 above, the LLC shall cease to carry on its Business, except insofar as may be necessary for the winding up of its Business. The LLC shall continue as a company for the purpose of prosecuting and defending suits, actions, proceedings and claims of any kind or nature by or against it and of enabling it gradually to settle and close its Business, to collect and discharge its obligations, to dispose of and convey its Property and to distribute its assets and Property, but not for continuing the Business for which it was established.

10.3    **Limitation on Actions by or Against Dissolved LLC.** The dissolution of the LLC shall not impair any remedy or cause of action available to or against it or its Manager, Committee Members or Members arising before its dissolution and commenced with two (2) years after the date of the dissolution.

10.4    **Distribution of Net Proceeds Upon Liquidation.** The Members shall continue to divide Net Profits and Net Losses and Available Cash Flow during the winding-up period in the same manner and the same priorities as provided for in Articles 4 and 5 hereof. The proceeds from the liquidation of Property shall be applied to liabilities of the LLC in the following order:

10.4.1.    First, to the payment of creditors, in the order of priority as provided by law, except to Members on account of their contributions;

10.4.2.    Second, to the payment of loans or advances that may have been made by any of the Members or their Principals for working capital or other requirements of the LLC;

10.4.3.    Third, pro rata, to the Class A Members and the Class C Members in accordance with their positive Capital Account balances;

10.4.4.    Fourth, to the Class B Members in accordance with their positive Capital Account balances; and

10.4.5.    Thereafter, pro rata, to the Members in accordance with their positive Capital Account balances, as determined after taking into account all Capital Account adjustments for the Fiscal Year during which the liquidation occurs.

Liquidation proceeds will be paid within 60 days after the end of the Fiscal Year (or, if later, within 120 days after the date of the liquidation). The Company may offset damages for breach of this Agreement by any Member whose Units are liquidated upon the liquidation of the Company against the amount otherwise distributable to such Member.

Where the distribution pursuant to this Section 10.4 consists both of cash (or cash equivalents) and non-cash assets, the cash (or cash equivalents) shall first be distributed, in a descending order, to fully satisfy each category starting with the most preferred category above. In the case of noncash assets, the distribution values are to be based on the fair market value thereof as determined in good faith by the liquidator, and the shortest maturity portion of such non-cash assets (*e.g.*, notes or other indebtedness) shall, to the extent such non-cash assets are readily divisible, be distributed, in a descending order, to fully satisfy each category above, starting with the most preferred category.

## ARTICLE 11
## ISSUANCE OF LLC CERTIFICATES

11.1.    **Issuance of LLC Certificates.** The Units of each Member in the LLC may be represented by an LLC certificate designating the classes of membership and Units. Upon the execution of this Agreement and the payment of the Capital Contributions by the Members pursuant to Article 3 hereof, the Manager may cause the LLC to issue one or more certificates in the name of each Member certifying that the Member named therein is the record holder of the Units of Interests set forth therein. For purposes of this Agreement, the term "**record holder**" shall mean the Member whose name appears in Section 3.1 as the Member owning the Units at issue.

11.2.    **Transfer of LLC Certificates.** A Membership Interest which is transferred in accordance with the terms of Article 8 of this Agreement shall be transferable on the books of the LLC by the record holder thereof in person or by such record holder's duly authorized attorney, but, except as provided in Section 11.3 below with respect to lost, stolen or destroyed certificates, no transfer of Units of Membership Interest shall be entered until the previously issued LLC certificate representing such Units shall have been surrendered to the LLC and canceled and a replacement LLC certificate issued to the transferee of such Membership Interest in accordance with such procedures as the Members may from time to time establish. The Members shall cause the Manager to issue to the transferring Member a new LLC certificate representing the Units of Membership Interests not being transferred by the Member, in the event such Member only transferred some, but not all, of the Units represented by the original LLC certificate. Except as otherwise required by law, the LLC shall be entitled to treat the record holder of an LLC certificate on its books as the owner thereof for all purposes regardless of any notice or knowledge to the contrary.

11.3.    **Lost, Stolen or Destroyed Certificates.** The LLC shall issue a new LLC certificate in place of any LLC Certificate previously issued if the record holder of the LLC Certificate:

11.3.1.    Makes proof by affidavit, in form and substance satisfactory to the Manager that a previously issued LLC certificate has been lost, destroyed or stolen;

11.3.2.    Requests the issuance of a new LLC certificate before the LLC has notice that the LLC certificate has been acquired by a purchaser for value in good faith and without notice of an adverse claim;

11.3.3.    If requested by the remaining Members, delivers to the LLC a bond, in form and substance reasonably satisfactory to the remaining Members, with such surety or sureties and with fixed or open penalty as the remaining Members may direct, in their reasonable discretion, to indemnify the LLC against any claim that may be made on account of the alleged loss, destruction or theft of the LLC certificate; and

11.3.4.    Satisfies any other reasonable requirements imposed by the Members or the Management Committee.

If a Member fails to notify the LLC within a reasonable time after it has notice of the loss, destruction or theft of an LLC certificate, and a transfer of the Units of Membership Interest represented by the LLC certificate is registered before receiving such notification, the LLC shall have no liability with respect to any claim against the LLC for such transfer or for a new LLC certificate.

## ARTICLE 12
## INDEMNIFICATION

12.1.    **Indemnification of the Members and Their Principals.** The LLC shall indemnify and hold harmless each of the Members, the Manager, the Committee Members, their Affiliates and each of their respective officers, directors, managers, trustees, members, shareholders, partners, employees, agents and Principals (individually, an **"Indemnitee"**) from and against any and all losses, claims, demands, costs, damages, liabilities, joint and several, expenses of any nature (including reasonable attorneys' fees and disbursements), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, whether civil, criminal, administrative or investigative, in which the Indemnitee is involved as a party arising out of the Business of the LLC, excluding liabilities to any Member, regardless of whether the Indemnitee continues to be a Member, an Affiliate, or an officer, director, employee, agent or Principal of the Member at the time any such liability or expense is paid or incurred, to the fullest extent permitted by the NRS and all other applicable laws, *provided* that the Member or such Person acted in good faith, within what is reasonably believed to be the scope of its authority and for a purpose which it reasonably believed to be in the best interests of the LLC and the Members or otherwise in compliance with the provisions of this Agreement; provided, however (i) that the LLC shall not be required to indemnify any Indemnitee, and any such Indemnitee shall be liable, for any loss, expense or damage which the LLC may suffer as a result of (A) such Indemnitee's willful misconduct, gross negligence or bad faith in failing to perform its duties hereunder, (B) actions taken by such Indemnitee in violation of this Agreement, (C) the receipt by such Indemnitee of any financial benefits to which it is not entitled pursuant to this Agreement, or (D) the vote by such Indemnitee for

a distribution of funds of the LLC in violation of this Agreement or the Act; (ii) the LLC shall not be required to indemnify any Indemnitee for any breach of the provisions of this Agreement, or for any loss, expense or damage which it may suffer as a result of the breach of this Agreement by the Member to which the Indemnitee is related; and (iii) any liability hereunder shall be limited solely to the assets and properties of the LLC, and no Member (or any Affiliate of any Member) shall have any liability or obligation by reason of these indemnification provisions.

The foregoing provisions of this Article 12 shall survive for a period of four (4) years from the date of dissolution of the LLC; provided, if at the end of such period, there are any actions, proceedings or investigations then pending, the Manager shall so notify the Members at such time (which notice shall include a brief description of each such action, proceeding or investigation and of the liabilities asserted therein), and the foregoing provisions of this Article 12 shall survive with respect to each such action, proceeding or investigation set forth in such notice (or any related action, proceeding or investigation based upon the same or similar claims) until such date as such action, proceeding or investigation is ultimately resolved.

The LLC shall not incur the cost of the portion of any insurance, other than public liability insurance, which insures the Manager or Committee Members against any liability as to which the Manager or Committee Members are herein prohibited from being indemnified.

12.2. **Expenses.** Expenses incurred by an Indemnitee in defending any claim, demand, action, suit or proceeding subject to Section 12.1 above may, from time to time, be advanced by the LLC prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the LLC of an undertaking by or on behalf of the Indemnitee to repay such amount if it shall be determined that such Person is not entitled to be indemnified as authorized in Section 12.1.

12.3. **Indemnification Rights Non-Exclusive.** The indemnification provided by Section 12.1 shall be in addition to any other rights to which those indemnified may be entitled under any agreement, Vote of the Members, as a matter of law or equity or otherwise, both as to action in the Indemnitee's capacity as a Member, as an Affiliate or as an officer, director, employee, agent or Principal of a Member and as to any action in another capacity, and shall continue as to an Indemnitee who has ceased to serve in such capacity and shall inure to the benefit of the heirs, successors, assigns and administrators of the Indemnitee.

12.4. **Errors and Omissions Insurance.** The LLC may purchase and maintain insurance, at the LLC's expense, on behalf of the Members and such other Persons as the Members shall determine, against any liability that may be asserted against, or any expense that may be incurred by, such Person in connection with the activities of the LLC and/or the Members' acts or omissions as the Members of the LLC regardless of whether the LLC would have the power to indemnify such Person against such liability under the provisions of this Agreement.

## ARTICLE 13
## AMENDMENTS

13.1.  **Amendment or Modification of the Agreement.** Except for the authority granted to the Manager hereunder to amend **EXHIBIT A** to this Agreement from time to time without the necessity of a formal amendment to this Agreement, the terms and provisions of this Agreement may not be adopted, altered, amended, or repealed and a new operating agreement adopted without the approval by a Majority in Interest of the Members.

13.2.  **Amendment or Modification of Articles of Organization.** Except for the authority granted to the Manager hereunder to amend or correct the Articles of Organization, and notwithstanding any other provision to the contrary in the Articles of Organization or this Agreement, in no event shall the Articles of Organization be amended without the approval by a Majority in Interest of the Members.

## ARTICLE 14
## NOTICES; WAIVER OF NOTICE

14.1.  **Method of Notice.** Any notice or communication required or permitted to be given hereunder shall be in writing and may be either (i) personally delivered, which shall be deemed received at the time of actual receipt thereof; or (ii) sent by registered or certified mail, with postage and charges prepaid, which shall be deemed delivered seventy-two (72) hours after deposit in the United States mail; or (iii) delivered by facsimile transmission, which shall be deemed received on the date and at the time of electronic confirmation of such transmission, provided an original mechanical signed copy of such notice or other communication is also immediately deposited in the United States mail with first-class postage and charges prepaid; or (iv) delivered by messenger, FedEx or other trackable courier service, which shall be deemed delivered on the date and at the time as tracked and confirmed by such courier service; and in each case, addressed or delivered to the party to whom the same is directed at such party's address and/or facsimile number set forth below, or at such other address and/or facsimile number as that party may specify by written notice given to the other parties in accordance with this paragraph:

### If to the LLC;

eTreppid Technologies, LLC
Attn: Warren Trepp, Its Management Committee Chairman
590 Lakeshore Boulevard
Incline Village, Nevada 89451
Mailing Address:
P.O. Box 4964
Incline Village, Nevada 89450
Facsimile: (775) 831-4395

### With a Courtesy Copy to:

> Frye & Hsieh, LLP
> Attn: Douglas J. Frye, Esq.
> 24955 Pacific Coast Highway, Suite A201
> Malibu, California 90265-4747
> Facsimile: (310) 456-0808

### If to the Members:

> To the address of each Member as set
> forth on **EXHIBIT A** attached hereto and
> made a part of this Agreement, which
> exhibit may be amended from time to
> time as appropriate.

Where courtesy copies are provided for, the service of any such courtesy copy shall not constitute notice to the party hereunder. If the United States Postal Service returns to the LLC or the registered agent any notice as undeliverable, all future notices to that Member shall be deemed duly given if kept available for that Member at the LLC's principal place of business for one (1) year.

14.2.  **Waiver of Notice.** Notwithstanding the foregoing, when, pursuant to the provisions of the NRS, the Articles of Organization or this Agreement, notice is required to be given to a Member or to the Manager of the LLC, a waiver in writing signed by the Person or Persons entitled to the notice, whether before or after the time stated in it, is equivalent to the giving of notice.

### ARTICLE 15
### MISCELLANEOUS PROVISIONS

15.1.  **Counterparts.** This Agreement may be executed in several counterparts, including any counterpart signature pages executed by a new Member or Substitute Member after the execution hereof, and all counterparts so executed shall constitute one Agreement, binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart.

15.2.  **Survival of Rights.** This Agreement shall be binding upon, and, as to permitted or accepted successors, transferees and assigns, inure to the benefit of the Members and the LLC and their respective heirs, legatees, legal representatives, successors, transferees and assigns, in all cases whether by the laws of descent and distribution, merger, reverse merger, consolidation, sale of assets, other sale, operation of law or otherwise.

15.3.  **Severability.** In the event any section, subsection or any sentence within any section or subsection hereunder is declared by a court of competent jurisdiction to be void or unenforceable, such section, subsection or sentence shall be deemed severed from the remainder of this Agreement and the balance of this Agreement shall remain in full force and effect.

15.4. **Construction.** The language in all parts of this Agreement shall be in all cases construed simply according to its fair meaning and not strictly for or against any of the Members.

15.5. **Section Headings.** The captions of the Articles, Sections or subsections in this Agreement are for convenience only and in no way define, limit, extend or describe the scope or intent of any of the provisions hereof, shall not be deemed part of this Agreement and shall not be used in construing or interpreting this Agreement.

15.6. **Governing Law.** This Agreement and any amendments or exhibits hereto, and the rights and obligations of the parties hereunder, is executed under and in conformity with the laws of the State of NEVADA relating to limited-liability companies and is to be construed, enforced and governed in accordance therewith without giving effect to any conflict of law provision.

15.7. **Additional Documents.** Each Member, upon the request of another Member, agrees to perform all further acts and execute, acknowledge and deliver all documents which may be reasonably necessary, appropriate or desirable to carry out the provisions of this Agreement, including but not limited to acknowledging before a notary public any signature heretofore or hereafter made by a Member.

15.8. **Pronouns and Plurals.** Whenever the context may require, any pronoun used in this Agreement shall include the corresponding masculine, feminine and neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa.

15.9. **Time of the Essence.** Except as otherwise provided herein, time is of the essence in connection with each and every provision of this Agreement.

15.10. **Further Actions.** Each of the Members agrees to execute, acknowledge and deliver such additional documents, and take such further actions, as may reasonably be required from time to time to carry out each of the provisions, and the intent, of this Agreement, and every agreement or document relating hereto, or entered into in connection herewith.

15.11. **ARBITRATION OF DISPUTES.** ANY MEMBER HERETO MAY REQUIRE THE ARBITRATION OF ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY RELATED AGREEMENT. SUCH MEMBER MAY INITIATE AND REQUIRE ARBITRATION BY GIVING NOTICE TO THE OTHER PARTIES SPECIFYING THE MATTER TO BE ARBITRATED. IF LEGAL ACTION IS ALREADY PENDING ON ANY MATTER CONCERNING WHICH THE NOTICE IS GIVEN, THE NOTICE SHALL NOT BE EFFECTIVE UNLESS GIVEN BY THE DEFENDANT THEREIN AND GIVEN BEFORE THE EXPIRATION OF TWENTY (20) DAYS AFTER SERVICE OF PROCESS ON THE PERSON GIVING THE NOTICE. EXCEPT AS PROVIDED TO THE CONTRARY IN THESE PROVISIONS ON ARBITRATION, THE ARBITRATION SHALL BE IN CONFORMITY WITH AND SUBJECT TO APPLICABLE RULES AND PROCEDURES OF THE AMERICAN ARBITRATION ASSOCIATION (OR ANY SUCCESSOR THERETO). IF THE AMERICAN ARBITRATION ASSOCIATION IS NOT THEN IN EXISTENCE AND THERE IS NO SUCCESSOR, OR IF FOR ANY REASON THE AMERICAN ARBITRATION ASSOCIATION FAILS OR REFUSES TO ACT, THE ARBITRATION SHALL BE IN CONFORMITY WITH

AND SUBJECT TO THE PROVISIONS OF APPLICABLE NEVADA STATUTES (IF ANY) RELATING TO ARBITRATION AT THE TIME OF THE NOTICE. THE ARBITRATORS SHALL BE BOUND BY THIS AGREEMENT AND ALL RELATED AGREEMENTS. PLEADINGS IN ANY ACTION PENDING ON THE SAME MATTER SHALL, IF ARBITRATION IS REQUIRED AS AFORESAID, BE DEEMED AMENDED TO LIMIT THE ISSUES TO THOSE CONTEMPLATED BY THE RULES PRESCRIBED ABOVE. EACH MEMBER SHALL PAY THE COSTS OF ARBITRATION, INCLUDING ARBITRATOR'S FEES, AS AWARDED BY THE ARBITRATOR(S). THE NUMBER AND SELECTION OF ARBITRATOR(S) SHALL BE IN ACCORDANCE WITH THE RULES PRESCRIBED ABOVE, EXCEPT THAT (i) EACH ARBITRATOR SELECTED SHALL BE NEUTRAL AND FAMILIAR WITH THE PRINCIPAL SUBJECT MATTER OF THE ISSUES TO BE ARBITRATED, SUCH AS, BY WAY OF EXAMPLE ONLY, TECHNOLOGY AND SOFTWARE DEVELOPMENT, OR SUCH OTHER SUBJECT MATTER AS MAY BE AT ISSUE, (ii) THE TESTIMONY OF WITNESSES SHALL BE GIVEN UNDER OATH, AND (iii) DEPOSITIONS AND OTHER DISCOVERY MAY BE ORDERED BY THE ARBITRATOR(S).

THE PROVISIONS OF THIS SECTION SHALL IN NO WAY LIMIT THE RIGHT OF THE LLC OR ANY MEMBER TO OBTAIN PROVISIONAL OR ANCILLARY REMEDIES FROM A COURT OF COMPETENT JURISDICTION BEFORE, AFTER, OR DURING THE PENDENCY OF ANY ARBITRATION PROCEEDING. THE EXERCISE OF SUCH REMEDY SHALL NOT WAIVE THE RIGHT OF THE ANY OF THE LLC OR ANY MEMBER TO ARBITRATE.

**NOTICE:** BY EXECUTING THIS AGREEMENT, YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE AARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE APPLICABLE STATE STATUTE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY. NOTHING CONTAINED HEREIN SHALL PREVENT ANY MEMBER FROM SEEKING EQUITABLE REMEDIES FROM A COURT OF COMPETENT JURISDICTION.

15.12. **WAIVER OF JURY TRIAL.** WITH RESPECT TO ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY RELATED AGREEMENT, AS TO WHICH NO MEMBER INVOKES THE RIGHT TO ARBITRATION HEREIN PROVIDED, OR AS TO WHICH LEGAL ACTION NEVERTHELESS OCCURS, EACH MEMBER HEREBY IRREVOCABLY WAIVES ALL RIGHTS IT MAY HAVE TO DEMAND A JURY TRIAL. THIS WAIVER IS KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY THE MEMBERS AND EACH MEMBER ACKNOWLEDGES THAT NONE OF THE OTHER MEMBERS NOR ANY PERSON ACTING ON BEHALF OF THE OTHER PARTIES HAS MADE ANY REPRESENTATION OF FACT TO INDUCE THIS WAIVER OF TRIAL BY

JURY OR IN ANY WAY TO MODIFY OR NULLIFY ITS EFFECT. THE MEMBERS EACH FURTHER ACKNOWLEDGE THAT IT HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL. THE MEMBERS EACH FURTHER ACKNOWLEDGES THAT IT HAS READ AND UNDERSTANDS THE MEANING AND RAMIFICATIONS OF THIS WAIVER PROVISION.

15.13. **Third Party Beneficiaries.** There are no third party beneficiaries of this Agreement except (i) Affiliates and Principals of the Members and (ii) any other Persons as may be entitled to the benefits of Article 12.1 hereof.

15.14. **No Partition.** The Members agree that the Property that the LLC may own or have an interest in is not suitable for partition. Each of the Members hereby irrevocably waives any and all rights that it may have to maintain any action for partition of any Property the LLC may at any time have an interest in.

15.15. **Entire Agreement.** This Agreement, together with all exhibits hereto, and the Articles of Organization constitute the entire agreement of the Members with respect to, and supersedes all prior written and oral agreements, understandings and negotiations with respect to, the subject matter hereof.

15.16. **Waiver.** No failure by any party to insist upon the strict performance of any covenant, duty, agreement or condition of this Agreement or to exercise any right or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or any other covenant, duty, agreement or condition.

15.17. **Attorneys' Fees.** In the event of any litigation, arbitration or other dispute arising as a result of or by reason of this Agreement, the prevailing party in any such litigation, arbitration or other dispute shall be entitled to, in addition to any other damages assessed, its reasonable attorneys' fees, and all other costs and expenses incurred in connection with settling or resolving such dispute. The attorneys' fees which the prevailing party is entitled to recover shall include fees for prosecuting or defending any appeal and shall be awarded for any supplemental proceedings until the final judgment is satisfied in full. In addition to the foregoing award of attorneys' fees to the prevailing party, the prevailing party in any lawsuit or arbitration procedure on this Agreement shall be entitled to its reasonable attorneys' fees incurred in any post judgment proceedings to collect or enforce the judgment. This attorneys' fees provision is separate and several and shall survive the merger of this Agreement into any judgment.

15.18 **Authority.** Each signatory to this Agreement represents and warrants that he or she possesses all necessary capacity and authority to act for, sign, and bind the respective entity on whose behalf he or she is signing.

(The remainder of this page intentionally left blank.
This Agreement continued and signed on the following pages.)

## SIGNATURES OF THE PARTIES

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered, or caused to be executed and delivered by a duly authorized representative, this AMENDED AND RESTATED OPERATING AGREEMENT of eTreppid Technologies, LLC as of the day and year first above written and certify that this Amended and Restated Operating Agreement is hereby approved and duly adopted by the undersigned Class A Members entitled to Vote effective as of NOVEMBER 1, 2001.

Further, the undersigned, as Members of the LLC, acknowledge they have read and understand the foregoing Amended and Restated Operating Agreement for eTreppid Technologies, LLC, including specifically, but not limited to, Sections 15.11 and 15.12, "Arbitration of Disputes," and "Waiver of Jury Trial," respectively, and, as evidenced by their signatures below, the undersigned hereby acknowledge and agree to the provisions contained herein.

eTreppid Technologies, LLC
A Nevada Limited-Liability Company
By Its Voting Class A Members

CLASS A MEMBERS:

FRIENDLY CAPITAL PARTNERS, L.P.
A California Limited Partnership
By: Friendly Capital, Inc., A Nevada Corporation
     Its General Partner

By:_____
     WARREN TREPP, Its President

THE FREMONT TRUST, DATED MAY 16, 1994
A Nevada Revocable Trust

By:_____
     WARREN TREPP, Its Trustee

MONTGOMERY FAMILY TRUST
A California Revocable Trust

By:_____
     DENNIS MONTGOMERY, Its Co-Trustee

By:_____
     BRENDA K. MONTGOMERY, Its Co-Trustee

## ACCEPTANCE OF APPOINTMENT
## OF THE MANAGER, COMMITTEE MEMBERS
## AND CHIEF TECHNOLOGY OFFICER

Each of the undersigned hereby (i) accepts his respective appointment as a Manager, Committee Member or officer of the LLC for the term stated in this Operating Agreement or as otherwise set by the Management Committee; (ii) acknowledges he has read and understands the foregoing Operating Agreement of the LLC, particularly the restrictions contained in Article 6 thereof, and agrees to be bound by the terms, provisions, covenants and restrictions set forth in said Operating Agreement, as amended from time to time; and (iii) hereby agrees to undertake the performance of his duties, responsibilities and obligations of each respective office in accordance with terms of this Operating Agreement, the Articles of Organization and the applicable provisions of Nevada law, as any and all may be amended from time to time.

_____
WARREN TREPP, as to his appointment as
Chairman and Committee Member

_____
DOUGLAS J. FRYE, as to his appointment as
Manager and Committee Member

_____
DENNIS MONTGOMERY, as to his appointment as
Chief Technology Officer and Committee
Member

## eTreppid Technologies, LLC

## AMENDED AND RESTATED OPERATING AGREEMENT
## POST-EFFECTIVE EXECUTION PAGE

By his, her or its signature below, the undersigned hereby consents to and agrees to be bound by the terms and provisions of that certain Amended and Restated Operating Agreement dated effective as of November 1, 2001 between eTreppid Technologies, LLC, a Nevada limited liability company (the "Company"), and its Members (as amended from time to time, the "Operating Agreement"), a current copy of which has been received by the undersigned from the Company.

The undersigned hereby acknowledges that the undersigned has received and reviewed the Operating Agreement. The undersigned hereby further acknowledges and agrees that the undersigned shall have all of the rights, preferences and obligations under the Operating Agreement as a "Class A Member," "Class B Member," or "Class C Member" or, generally as a "Member," as defined and used therein. The undersigned's execution of this Amended and Restated Operating Agreement Post-Effective Execution Page constitutes the undersigned's execution and acceptance of the Operating Agreement, and this Amended and Restated Operating Agreement Post-Effective Execution Page shall constitute an executed counterpart to the Operating Agreement, including any future amendments, restatements or modifications thereof which may be duly approved and adopted in accordance therewith.

IN WITNESS WHEREOF, this Amended and Restated Operating Agreement Post-Effective Execution Page has been executed by the undersigned as of ___December 1___, 2001.

| **SIGNATURE BLOCK FOR INDIVIDUAL MEMBER:** | **SIGNATURE BLOCK FOR ENTITY MEMBER:** |
|---|---|
| DOUGLAS J. FRYE<br>Name (Print or Type) | _____<br>Name of Entity or Trust |
| | By:_____ |
| Signature | Signature |
| **SIGNATURE BLOCK FOR JOINT MEMBER (IF ANY):** | _____<br>Name of Authorized Representative |
| _____<br>Name (Print or Type) | _____<br>Title or Authorized Capacity |
| _____<br>Signature | |

## eTreppid Technologies, LLC

### AMENDED AND RESTATED OPERATING AGREEMENT
### POST-EFFECTIVE EXECUTION PAGE

By his, her or its signature below, the undersigned hereby consents to and agrees to be bound by the terms and provisions of that certain Amended and Restated Operating Agreement dated effective as of November 1, 2001 between eTreppid Technologies, LLC, a Nevada limited liability company (the "Company"), and its Members (as amended from time to time, the "Operating Agreement"), a current copy of which has been received by the undersigned from the Company.

The undersigned hereby acknowledges that the undersigned has received and reviewed the Operating Agreement. The undersigned hereby further acknowledges and agrees that the undersigned shall have all of the rights, preferences and obligations under the Operating Agreement as a "Class A Member," "Class B Member," or "Class C Member" or, generally as a "Member," as defined and used therein. The undersigned's execution of this Amended and Restated Operating Agreement Post-Effective Execution Page constitutes the undersigned's execution and acceptance of the Operating Agreement, and this Amended and Restated Operating Agreement Post-Effective Execution Page shall constitute an executed counterpart to the Operating Agreement, including any future amendments, restatements or modifications thereof which may be duly approved and adopted in accordance therewith.

IN WITNESS WHEREOF, this Amended and Restated Operating Agreement Post-Effective Execution Page has been executed by the undersigned as of ___DEC 1 2001___, 2001.

**SIGNATURE BLOCK FOR INDIVIDUAL MEMBER:**

_Dale S. Trepp_
Name (Print or Type)

_(signature)_
Signature

**SIGNATURE BLOCK FOR JOINT MEMBER (IF ANY):**

_____
Name (Print or Type)

_____
Signature

**SIGNATURE BLOCK FOR ENTITY MEMBER:**

_____
Name of Entity or Trust

By:_____
      Signature

_____
Name of Authorized Representative

_____
Title or Authorized Capacity

eTreppid Technologies, LLC

## AMENDED AND RESTATED OPERATING AGREEMENT
### POST-EFFECTIVE EXECUTION PAGE

By his, her or its signature below, the undersigned hereby consents to and agrees to be bound by the terms and provisions of that certain Amended and Restated Operating Agreement dated effective as of November 1, 2001 between eTreppid Technologies, LLC, a Nevada limited liability company (the "Company"), and its Members (as amended from time to time, the "Operating Agreement"), a current copy of which has been received by the undersigned from the Company.

The undersigned hereby acknowledges that the undersigned has received and reviewed the Operating Agreement. The undersigned hereby further acknowledges and agrees that the undersigned shall have all of the rights, preferences and obligations under the Operating Agreement as a "Class A Member," "Class B Member," or "Class C Member" or, generally as a "Member," as defined and used therein. The undersigned's execution of this Amended and Restated Operating Agreement Post-Effective Execution Page constitutes the undersigned's execution and acceptance of the Operating Agreement, and this Amended and Restated Operating Agreement Post-Effective Execution Page shall constitute an executed counterpart to the Operating Agreement, including any future amendments, restatements or modifications thereof which may be duly approved and adopted in accordance therewith.

IN WITNESS WHEREOF, this Amended and Restated Operating Agreement Post-Effective Execution Page has been executed by the undersigned as of __DEC 1 2001__, 2001.

**SIGNATURE BLOCK FOR INDIVIDUAL MEMBER:**

_____
Name (Print or Type)

_____
Signature

**SIGNATURE BLOCK FOR JOINT MEMBER (IF ANY):**

_____
Name (Print or Type)

_____
Signature

**SIGNATURE BLOCK FOR ENTITY MEMBER:**

THE WARREN EDWARD TREPP PERMANENT TRUST (FBO WARREN EDWARD TREPP)
Name of Entity or Trust

By: _____
        Signature

____Warren Trepp_____
Name of Authorized Representative

____Trustee_____
Title or Authorized Capacity

## CLASS B MEMBER SIGNATURE PAGE
## INTREPID TECHNOLOGIES, LLC

THE UNDERSIGNED hereby certifies and states that: (i) he or she is an original subscribing or transferee Class B Member of INTREPID TECHNOLOGIES, LLC, a Nevada limited liability company (the "Company"); (ii) he or she has read the Amended and Restated Operating Agreement of the Company dated and adopted as of January 1, 1999 (the "Intrepid Operating Agreement"), specifically including Article 9, "Restrictions on Transfer of Membership Interests; Admission and Substitution of New Members," and Sections 16.11 and 16.12, "Arbitration of Disputes," and "Waiver of Jury Trial," respectively, thereof; (iii) upon the prior approval by a Majority in Interest of the Members entitled to Vote concerning the Transfer of any Units of the Company or admission of any new Member to the Company pursuant to Article 9 of the Intrepid Operating Agreement (if so required), and upon executing and delivering this counterpart signature page to the Management Committee of the Company, he or she will become a new or substituted Class B Member, as the case may be, of the Company; and (iv) the execution of this Class B Member Signature Page shall constitute the undersigned's execution and delivery of the Intrepid Operating Agreement as a party thereto and shall constitute his acceptance and agreement to be bound by the terms and conditions thereof.

IN WITNESS WHEREOF, the undersigned, individually or by an authorized representative, has executed and delivered this CLASS B MEMBER SIGNATURE PAGE as of the day and year set forth below, which document shall be attached to and become a part of the Intrepid Operating Agreement.

**DATED AND EXECUTED ON:**

_11-1-99_

**NUMBER AND CLASS OF UNITS AND PERCENTAGE INTEREST PURCHASED OR TRANSFERRED:**

_250_ Class A Units

_____ Class B Units

_0.25_ % Percentage Interest

**AMOUNT OF ORIGINAL CAPITAL CONTRIBUTION OR PRO RATA AMOUNT OF ASSIGNED CAPITAL CONTRIBUTION:**

$ _6,500.00_

**SIGNATURE BLOCK FOR INDIVIDUAL MEMBER:**

_Joec A. SAFRIET_
Name (Print or Type)

_____
Signature

**SIGNATURE BLOCK FOR JOINT MEMBER (IF ANY):**

_____
Name (Print or Type)

_____
Signature

**SIGNATURE BLOCK FOR ENTITY MEMBER:**

A _____
Name of Entity or Trust

By: _____
Signature

_____
Name of Authorized Representative

_____
Title or Authorized Capacity

# CLASS B MEMBER SIGNATURE PAGE
## INTREPID TECHNOLOGIES, LLC

**THE UNDERSIGNED** hereby certifies and states that: (i) he or she is an original subscribing or transferee Class B Member of **INTREPID TECHNOLOGIES, LLC**, a Nevada limited liability company (the "Company"); (ii) he or she has read the Amended and Restated Operating Agreement of the Company dated and adopted as of January 1, 1999 (the "Intrepid Operating Agreement"), specifically including Article 9, "Restrictions on Transfer of Membership Interests; Admission and Substitution of New Members," and Sections 16.11 and 16.12, "Arbitration of Disputes," and "Waiver of Jury Trial," respectively, thereof; (iii) upon the prior approval by a Majority in Interest of the Members entitled to Vote concerning the Transfer of any Units of the Company or admission of any new Member to the Company pursuant to Article 9 of the Intrepid Operating Agreement (if so required), and upon executing and delivering this counterpart signature page to the Management Committee of the Company, he or she will become a new or substituted Class B Member, as the case may be, of the Company; and (iv) the execution of this Class B Member Signature Page shall constitute the undersigned's execution and delivery of the Intrepid Operating Agreement as a party thereto and shall constitute his acceptance and agreement to be bound by the terms and conditions thereof.

**IN WITNESS WHEREOF**, the undersigned, individually or by an authorized representative, has executed and delivered this CLASS B MEMBER SIGNATURE PAGE as of the day and year set forth below, which document shall be attached to and become a part of the Intrepid Operating Agreement.

**DATED AND EXECUTED ON:**

November 8 99

**NUMBER AND CLASS OF UNITS AND PERCENTAGE INTEREST PURCHASED OR TRANSFERRED:**

_____ Class A Units

___250___ Class B Units

__.25__ % Percentage Interest

**AMOUNT OF ORIGINAL CAPITAL CONTRIBUTION OR PRO RATA AMOUNT OF ASSIGNED CAPITAL CONTRIBUTION:**

$ 6,500.00

**SIGNATURE BLOCK FOR INDIVIDUAL MEMBER:**

Joyce Benka
Name (Print or Type)

Joyce Benka
Signature

**SIGNATURE BLOCK FOR JOINT MEMBER (IF ANY):**

_____
Name (Print or Type)

_____
Signature

**SIGNATURE BLOCK FOR ENTITY MEMBER:**

_____
Name of Entity or Trust

By: _____
Signature

_____
Name of Authorized Representative

_____
Title or Authorized Capacity

eTreppid Technologies, LLC

## AMENDED AND RESTATED OPERATING AGREEMENT
## POST-EFFECTIVE EXECUTION PAGE

By his, her or its signature below, the undersigned hereby consents to and agrees to be bound by the terms and provisions of that certain Amended and Restated Operating Agreement dated effective as of November 1, 2001 between eTreppid Technologies, LLC, a Nevada limited liability company (the "Company"), and its Members (as amended from time to time, the "Operating Agreement"), a current copy of which has been received by the undersigned from the Company.

The undersigned hereby acknowledges that the undersigned has received and reviewed the Operating Agreement. The undersigned hereby further acknowledges and agrees that the undersigned shall have all of the rights, preferences and obligations under the Operating Agreement as a "Class A Member," "Class B Member," or "Class C Member" or, generally as a "Member," as defined and used therein. The undersigned's execution of this Amended and Restated Operating Agreement Post-Effective Execution Page constitutes the undersigned's execution and acceptance of the Operating Agreement, and this Amended and Restated Operating Agreement Post-Effective Execution Page shall constitute an executed counterpart to the Operating Agreement, including any future amendments, restatements or modifications thereof which may be duly approved and adopted in accordance therewith.

IN WITNESS WHEREOF, this Amended and Restated Operating Agreement Post-Effective Execution Page has been executed by the undersigned as of *DEC 5*, 2001.

**SIGNATURE BLOCK FOR INDIVIDUAL MEMBER:**

*JUDY HAMACHER*
Name (Print or Type)

*Judy Hamacher*
Signature

**SIGNATURE BLOCK FOR JOINT MEMBER (IF ANY):**

_____
Name (Print or Type)

_____
Signature

**SIGNATURE BLOCK FOR ENTITY MEMBER:**

_____
Name of Entity or Trust

By: _____
Signature

_____
Name of Authorized Representative

_____
Title or Authorized Capacity

eTreppid Technologies, LLC

## AMENDED AND RESTATED OPERATING AGREEMENT
## POST-EFFECTIVE EXECUTION PAGE

By his, her or its signature below, the undersigned hereby consents to and agrees to be bound by the terms and provisions of that certain Amended and Restated Operating Agreement dated effective as of November 1, 2001 between eTreppid Technologies, LLC, a Nevada limited liability company (the "Company"), and its Members (as amended from time to time, the "Operating Agreement"), a current copy of which has been received by the undersigned from the Company.

The undersigned hereby acknowledges that the undersigned has received and reviewed the Operating Agreement. The undersigned hereby further acknowledges and agrees that the undersigned shall have all of the rights, preferences and obligations under the Operating Agreement as a "Class A Member," "Class B Member," or "Class C Member" or, generally as a "Member," as defined and used therein. The undersigned's execution of this Amended and Restated Operating Agreement Post-Effective Execution Page constitutes the undersigned's execution and acceptance of the Operating Agreement, and this Amended and Restated Operating Agreement Post-Effective Execution Page shall constitute an executed counterpart to the Operating Agreement, including any future amendments, restatements or modifications thereof which may be duly approved and adopted in accordance therewith.

IN WITNESS WHEREOF, this Amended and Restated Operating Agreement Post-Effective Execution Page has been executed by the undersigned as of **DEC 1 2001**, 2001.

**SIGNATURE BLOCK FOR INDIVIDUAL MEMBER:**

_____
Name (Print or Type)

_____
Signature

**SIGNATURE BLOCK FOR JOINT MEMBER (IF ANY):**

_____
Name (Print or Type)

_____
Signature

**SIGNATURE BLOCK FOR ENTITY MEMBER:**

_JOHN E. DRINKWATER (Trust)_
Name of Entity or Trust

By _John E. Drinkwater Sr._
Signature

_____
Name of Authorized Representative

_(Trustee)_
Title or Authorized Capacity